Filed 1/8/14  P. v. Wallace CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>DENNIS WALLACE et al.,<br><br>        Defendants and Appellants. | B243535<br>(Los Angeles County<br>Super. Ct. No. YA075709) |

APPEALS from judgments of the Superior Court of Los Angeles County. James R. Brandlin, Judge.  Affirmed as modified.

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant Dennis Wallace.

John G. Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant Raymond Gibbs.

Joshua C. Needle, under appointment by the Court of Appeal, for Defendant and Appellant Deeya Khalill.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In an amended information filed by the Los Angeles District Attorney, appellants Dennis Wallace (Wallace), Raymond Gibbs (Gibbs), and Deeya Khalill (Khalill) were charged in count one with the murder of Adiel Quezada (Quezada; Pen. Code, § 187, subd. (a)).[1]  In count two, Wallace and Khalill were charged with the murder of Tyronn Bickham (Bickham, § 187, subd. (a)).  As to both counts, it was further alleged that a principal personally and intentionally discharged a firearm proximately causing the deaths.  (§ 12022.53, subds. (d) & (e)(1).)  A special circumstance of multiple murder was also alleged.  (§ 190.2, subd. (a)(3).)  In count three, Wallace and Khalill were charged with the attempted murder of Emond Taylor (Taylor; §§ 187, subd. (a), 664.)  Pursuant to section 664, it was further alleged that the attempted murder was committed willfully, deliberately, and with premeditation.  As to count three, it was also alleged that a principal was armed with a firearm.  (§ 12022, subd. (a)(1).)  And, pursuant to section 186.22, subdivision (b)(1)(C), it was alleged that the charged offenses were committed for the benefit of, at the direction of, and in association with a criminal street gang.

Appellants pled not guilty and denied the allegations.  A jury convicted appellants of the charged offenses, found the murders in counts one and two to be first degree murders, and found the allegations to be true.

The trial court sentenced Wallace and Khalill to life in prison without the possibility of parole for counts one and two, plus two terms of 25 years to life for the section 12022.53 allegations.  The 10-year sentences for the section 186.22 allegations as to counts one and two were stayed.  For count three, Wallace was sentenced to state prison for life, plus 11 years (one year for the section 12022 allegations and 10 years for the section 186.22 allegation).

Gibbs was sentenced to 50 years to life for count one, consisting of 25 years to life for the murder and 25 years to life for the section 12022.53 allegation.

Appellants timely appealed.

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

We agree that the trial court improperly imposed a 10-year gang enhancement on count three against Wallace and Khalill. As such, the 10-year sentence on count three is stricken and replaced with a 15-year minimum parole eligibility term. (§ 186.22, subd. (b)(5).) It follows that Gibbs is entitled to the 15-year minimum term for his sentence on count one. We also agree that all of the appellants are jointly and severally liable for victim restitution on count one and that Khalill and Wallace are jointly and severally liable for victim restitution in count two. Thus, the abstracts of judgment must also be modified to so reflect. In all other respects, the judgments are affirmed.

## FACTUAL BACKGROUND

I. *Prosecution Evidence*

A. <u>Evidence Related to Counts Two and Three (the Attempted Murder of Taylor and the Murder of Bickham)</u>

On August 10, 2001, at approximately 10:30 p.m., Taylor was living in a duplex on San Pedro Street, which was frequented by the 135 Piru gang. Taylor was at home with his brother and his friend, Bickham.

Taylor had seen Khalill and Wallace in the neighborhood during the five years he had lived there. On several occasions, Wallace had asked Taylor where he was from, and Taylor responded that he did not "gangbang" and was "from nowhere." Taylor and Bickham were not gang members, and Taylor did not associate with a gang.

At some point, Taylor and Bickham went outside to the front yard and walked towards Bickham's brown Caprice. A female joined them. As Taylor, Bickham, and the woman stood near the trunk of the car, Taylor saw a white Nissan Altima that he had seen "all the time." The Altima was coming from Piru Street and slowed down as it passed Taylor and Bickham.

Taylor saw four people in the car. Taylor could not clearly see the two people in the back of the car, but he could see the two people sitting in the front seat: Wallace was the driver and Khalill, known as "K-9," was in the passenger seat.[2]

As the Altima drove by, Taylor heard someone in the car say, "'They get a pass'" or "'Hey, you straight.'" The car drove past Taylor and his friends and continued down the street.

Several minutes later, after the female had departed, Taylor saw the Altima again. The Altima went across San Pedro Street and stopped near an alley. Taylor could see that Wallace and Khalill were still in the front seat of the car.

A person wearing a black hoodie got out of the back seat and walked to the corner. The person began shooting. Taylor ran towards his house, and Bickham ran in another direction. Taylor jumped over his fence, ran into the back, and entered his house. Taylor told his brother that someone was shooting at him.

A short time later, Taylor heard a knock on the door. When Taylor opened the door, he saw Bickham, who had been hit by gunshots. Bickham fell to the ground. Taylor called 9-1-1.

Bickham later died from his gunshot wounds.

Los Angeles County Sheriff's Deputy Richard White responded to the area. At the time, Bickham was being treated by paramedics. Deputy White attempted to speak to Bickham, but he was unable to do so.

Deputy White surveyed the area and observed bullet strikes to a nearby white Caprice and a fence. He also found 18 expended shell casings that were "spread out a little bit" in a yard. The recovered casings were from "7.62 by 39-millimeter" rounds and were all fired from the same weapon.

---

[2]    Taylor initially testified that Khalill was the driver and Wallace was the passenger, but then he realized that he had erred. Taylor also testified that Wallace was associated with the 135 Piru gang and that he had seen Wallace driving the Altima on prior occasions. Taylor sometimes saw Khalill in the car with Wallace. Taylor never saw Wallace's mother driving the Altima.

Deputy White questioned Taylor, who was distraught and said that he had seen four African-American males in a car and then he saw the shooter, who was also an African-American male. Taylor said that he turned and ran.

When Taylor spoke with the police, he did not tell them that he saw Wallace's Altima or that he had seen Wallace driving the Altima. Taylor did not mention the identities of the suspects because he still lived in the neighborhood and feared that they might return and kill him.

The following day, Wallace and Khalill, along with two others, went to Taylor's house in a white Caprice. Wallace asked Taylor what had happened the previous day. Taylor said that he did not know what had happened. The men suggested that perhaps "the Mexicans" had been involved in the shooting. Taylor was uncomfortable because he knew who had committed the shooting.

Taylor moved from the area after the shooting. He believed that "snitches" who talked to the police got "beat up or killed."

On August 13, 2001, Detective Frank Salerno interviewed Taylor over the telephone. At that time, Taylor indicated that someone named "Dennis" was the person who drove the Altima. Taylor had not seen anyone else drive that car.

On August 14, 2001, Detective Salerno again interviewed Taylor, who said that he had seen the Altima on prior occasions. Taylor stated that he saw the Altima a second time when it crossed San Pedro Street. The shooter exited the backseat of the car.

Taylor further relayed to Detective Salerno what had occurred on the day after the shooting.

At some point later, Taylor mentioned to Detective Salerno that the other person in the car was "K-9." Taylor said that Wallace and Khalill were members of "1 Tray 5," which meant that they were members of the 135 Piru gang. Taylor said that Wallace was the driver and that Khalill had been the passenger in the front seat. Detective Salerno checked "department resources" and uncovered one person in the 135 Piru gang named Dennis and someone else in the gang, Khalill, with the nickname of K-9.

5

Based on the information that he was given, Detective Salerno attempted to ascertain whether Khalill drove a white Caprice. He found that there was a release of liability in Khalill's name on that type of car. He then found the Caprice in an impound tow yard. Detective Salerno searched the vehicle and recovered a dark Nike hooded jacket from the trunk.

Detective Salerno also investigated whether Wallace had any connection to a white Nissan. He discovered that a white Nissan was registered to Wallace's mother.

Detective Salerno located photographs of Wallace and Khalill and placed them into photographic lineups. He then showed them to Taylor. In one photographic lineup, Taylor identified Wallace as the owner of the Nissan Altima and one of the people he had seen on the night of the shooting.

In another photographic lineup, Taylor identified Khalill as the passenger in the Altima. Taylor was "[c]ertain" of his identifications.

On September 5, 2001, Detective Salerno and his partner, Detective Robinson, notified Wallace and Khalill that they were under investigation for the murder of Bickham. On that date, the sheriff's department conducted a search of Wallace's residence, which was approximately four blocks south of where the shooting had occurred. At that time, Khalill was also in the residence. In a bedroom closet, deputies recovered a magazine for an AK-47 that was loaded with "7.62 by 39-millimeter" rounds. A fingerprint analysis was conducted on the magazine and rounds, but no fingerprints were recovered. A white Nissan Altima was located at the residence and impounded.

The murder went unsolved until 2010.

At the preliminary hearing in July 2010, Taylor identified Wallace and Khalill as being in the front seat of the Altima. Taylor again was "[c]ertain" of his identifications.

B. Evidence Related to Count One (Murder of Quezada)

1. *Quezada is shot to death*

On July 25, 2008, Steven Buchanan[3] (Buchanan) lived near the area of 139th Street and Avalon Boulevard in the City of Los Angeles. Khalill, whom Buchanan knew as K-9, lived nearby.

At approximately 8:30 p.m., Buchanan heard something that sounded like gunshots. He went outside and got into a vehicle with his friend.

Three to five minutes later, Buchanan saw a male clad in a hoodie running past the car as if "he had done something." The male ran across the street and stood on the sidewalk. The man eventually got into a black Chevy Tahoe that was driving by, and the Chevy then drove away.

Los Angeles County Sheriff's Deputy Jerry Montenegro went to Avalon Boulevard in response to a 9-1-1 call. Deputy Montenegro saw a male Hispanic, Quezada, bleeding from apparent gunshot wounds to his body. Paramedics unsuccessfully tried to resuscitate Quezada, who was pronounced dead at the scene.

Deputy Montenegro saw 12 nine-millimeter and five .40-caliber shell casings "spread about the scene" near Quezada. He also found five expended bullets.

The casings were examined, and it was determined that the 12 nine-millimeter casings were all fired from the same firearm. The .40-caliber casings were all fired from another firearm.

Quezada died from multiple gunshot wounds. He had 13 gunshot wounds that resulted in 22 holes in his body. Out of the 13 gunshot wounds, three of them were fatal. The nature of the bullet wounds was consistent with the shooter or shooters standing over the victim while firing the shots.

---

[3] At the time of trial, Buchanan was serving a sentence for criminal threats. In 1996, he had suffered a conviction for petty theft with a prior. Buchanan's family still lived in the area and he did not want to testify. During trial, Los Angeles County Sheriff's Deputy Richard Hartley saw Buchanan in the "general population male Black tank" at the courthouse; Buchanan and appellants were seated on the same bench and were having lunch.

7

Eight projectiles were recovered from Quezada's body. Four of the projectiles were nine-millimeter and could have been fired from the same weapon, such as a Glock. The remaining four projectiles were all .40-caliber Smith and Wesson ammunition that was fired from the same firearm. Israeli Military Industries manufactured a firearm, the Desert Eagle or Baby Eagle, with the same general rifling characteristics found on the .40-caliber projectiles.

Quezada belonged to the South Side Players gang and used the moniker Stomper. The place where Quezada lived and was killed was claimed by the Barrio 13 gang.

Detective Michael Valento responded to the area where Quezada was killed and noticed gang graffiti, including graffiti by the South Side Players and the B-13 gang, on the walls of an alley behind the apartment complex where Quezada was killed. There was no graffiti by the 135 Piru gang.

### 2. *Information from Samuel Feissa (Feissa)*

Feissa was a former member of the 135 Piru gang.[4] Appellants were also members of the 135 Piru gang. Wallace had the moniker "Poke"; Khalill had the moniker "K-9"; Gibbs had the moniker "Peanut."

Feissa lived "[f]airly close" to where Quezada was killed and could get there by car in approximately five to seven minutes.

Feissa had been to Khalill's house and had seen several guns, including a nine-millimeter handgun, a "Desert Eagle 40," and a nine-millimeter with an "extended clip."

Feissa worked as an informant for Sheriff Detective Sean Shaw, who gave Feissa "a couple of thousand" in "[i]ncrements." Detective Shaw also gave Feissa a Toyota Tercel to drive. Feissa received other benefits for being an informant, such as having one case that "disappear[ed]" and being released when he was pulled over by sheriff's deputies.

---

[4]     Feissa was deemed unavailable and his preliminary hearing testimony was read at the trial. He had a prior conviction for felony possession of marijuana and was on probation at the time of the preliminary hearing.

8

On July 28, 2008, Feissa was arrested for possessing a firearm. At that time, he told Detective Shaw about a murder that took place on July 25, 2008, on Avalon Boulevard.[5] In August 2008, Detective Shaw told Detective Valento that Feissa had information about Quezada's murder.

On August 7, 2008, Detective Valento interviewed Feissa. He investigated Feissa's case and determined that the gun that Feissa possessed was not the weapon that had been used to kill Quezada. Feissa was not prosecuted in the firearm case. Feissa was paid for the information he provided in appellants' case.

Although generic information about Quezada's murder had been publicized, the police had not released information that two guns were used to kill Quezada, that one of the weapons was a nine-millimeter, that the other weapon was a .40-caliber, that an eyewitness had seen a Chevy Tahoe leaving the area shortly after the shooting, or that Quezada was a South Side Player gang member.

Feissa said that he had previously met Quezada, who stated that he was from the South Side Players. He had warned Quezada that people might think that he belonged to the Barrio 13 gang.

Feissa was not present when Quezada was shot, but had heard about the crime during several conversations. On one occasion, Feissa had been at Khalill's house.[6] In addition to Khalill, Gibbs and others were there. Feissa asked Khalill about what had happened and told Khalill that the victim did not belong to a rival gang. Khalill responded, "'Kick Mexicans.'"

---

[5]     Feissa also had information on the murder of Juan Llanos (Llanos) a "shot-caller member" of the Barrio 13 gang, committed by Marcellous Prothro (Prothro) and Shawn Simpson (Simpson). Prior to Feissa's information, the murder of Llanos was unsolved. Feissa received $7,250 for the information he gave in the Llanos murder and Quezada's murder; Feissa did not receive a reward that was put up by Llanos's family. Prothro was arrested on July 31, 2009, in the Llanos murder.

[6]     Prior to arriving, Feissa had smoked a "[c]ouple of blunts" of marijuana.

At some point during the event, Feissa had a conversation with Gibbs. Feissa mentioned that the victim was not a rival gang member. Gibbs replied, "'Fuck Sarrios.'"[7]

During a telephone conversation, Khalill told Feissa that "they caught a Sarrio slipping." According to Feissa, Khalill said that he and Wallace had seen a rival gang member. They drove to Khalill's house on 139th Street. They retrieved "burners" (guns). They walked down the street and returned to Quezada, asked him where he was from, and then Khalill and Gibbs "dumped him out," meaning they shot Quezada. Appellants ran back to 139th Street. Wallace got into a dark blue Chevy Tahoe and left.

Approximately two or three months after the murder, Feissa had another conversation with Gibbs while they were attending a "function." Gibbs said that he and Khalill had walked over to Quezada, that Khalill had asked Quezada where he was from, and that Khalill and Gibbs had shot him while Wallace waited across the street as a "lookout and cover." Gibbs told Feissa that a "nine and 40" were used in the murder.[8] Gibbs then ran back to Khalill's house.

Gibbs said that Jerrod Taylor (Jerrod), known as "Baby Spoke," was supposed to do the murder and that he "bitched out" and became "[s]cared to put in work." Jerrod then joined the conversation. He said that "he had trucked it" (run fast), that "the homeys" had given him the guns (a "nine and 40"), and "that he had to hit the wall and . . . go [to] his house and put the guns up." Feissa told Jerrod that he was "fucked up for beating up Drip," Jerrod's neighbor, who had placed the guns in a trash can.

After obtaining information from Feissa, Detective Valento attempted to corroborate that information. He believed that the case was a "prime candidate for wiretap."

---

**7**    According to Feissa, "Sarrio" is a derogatory name for a member of the rival Barrio 13 gang.

**8**    Feissa later testified that he did not know what type of weapons were used in the murder.

10

On November 29, 2008, Detective John Duncan showed photographs of Wallace's Chevy Tahoe to Buchanan. Buchanan said that the vehicle depicted in the photographs looked similar to the one he saw on the night of Quezada's murder, but thought that the vehicle was darker.

C. Wiretaps of Appellants

Detective Duncan participated in a wiretap investigation involving the 135 Piru gang. The 135 Piru gang was targeted because it was suspected in some murders and shootings. As part of the wiretap investigation, appellants' telephone calls were monitored and recorded. Detective Duncan knew appellants and was familiar with their voices.

Also as part of the wiretap investigation, the police sometimes engaged in "stimulation tactics," such as serving search warrants or placing something in the media. All of these tactics were designed to "stimulate" gang members to converse with each other on the telephone.

Detective Duncan listened to a number of calls that were recorded pursuant to the wiretaps of 135 Piru gang members. In those calls, appellants never said anything to indicate that they were shocked that they were being charged with the murder; nor did they say that Feissa had murdered Quezada.

1. *Recorded telephone call between Khalill and Krystal Woolard (Woolard) on October 9, 2008*

On October 9, 2008, Woolard was incarcerated in jail for prostitution. During a recorded telephone call, Khalill said that he was "killing" people "out here."

2. *Telephone call between Gibbs and an unidentified female on February 17, 2009*

During the recorded telephone call, Gibbs and an unidentified female discussed death. Gibbs stated that some people at his funeral might say that he "'shot like [two]'" people.

11

### 3. *Recorded telephone calls on February 21, 2009*

On February 21, 2009, a stimulation was done using the television show, "L.A.'s Most Wanted." The show aired at 10:30 p.m. The sheriff's department gave the show some information on three different homicides to stimulate the suspected individuals involved in those crimes to have telephone conversations about the offenses. During the show, composite drawings of Wallace and Khalill were televised.

Shortly after the program aired, a telephone conversation was recorded between Wallace, someone named "Evil," and an unidentified male. During the conversation, Evil told Wallace that he heard that Wallace and K-9 had been on "America's Most Wanted" for "some shit" that had happened on "February 8th and the other day." Wallace said that he did not know "what the fuck they're talking about."

An unidentified male then came on the line. He stated that "whatever" or "wherever" Wallace went, he should let the unidentified male know so that he could get Wallace "some kind of little change to have in [his] pocket when [he] get[s] to where [he] is] going."

At 10:47 p.m., Gibbs called Wallace and asked if Evil had called. When Wallace stated that he had "just heard," Gibbs responded: "Ain't that some crazy shit?"

At 10:50 p.m., Gibbs and Khalill also had a telephone conversation. When Gibbs asked if Evil had called, Khalill replied, "Yea, blood well I'm outta here!" Khalill stated that he needed to "figure some shit out" and to see "what the fuck [was] going on." He added that he would be dropped off at "the whooptie."**[9]**

### 4. *Recorded telephone calls on February 24, 2009*

On February 24, 2009, another stimulation was done in which the police conducted searches on certain residences, including those of Khalill and Jerrod.

---

**[9]** According to Detective Duncan, "whooptie" replaces the noun that is being discussed and could be used instead of saying "car" or "neighborhood" or "gun."

During a recorded telephone conversation, Khalill told Wallace that the police threw him in the car and went "through [his] shit." Khalill said that a homicide detective asked "a gang of questions" about Wallace. Khalill denied knowing Wallace.

Khalill stated that the police had confiscated 30 photographs and "ransacked" his belongings. The police told him that they had "'aired that shit'" and that they had received 40 telephone calls. Khalill said that the police had found Gibbs's identification and wanted to know where he was.

Wallace asked Khalill if he had called "the baby." Khalill replied, "I called you first blood." Wallace said that he was going to school and advised Khalill to "keep [him] posted."

Khalill then stated that the "good thing [was] they obviously ain't got shit." He added that someone was talking to the police.

Wallace responded that he was surprised that the police had not searched his residence and said that he was going to call home to see if a search had begun, noting that "when they do shit like that, they hit everybody at the same time."

At 7:10 p.m., Gibbs called Jerrod, who stated that the police had "hit" his house. Jerrod said that the police had asked for Gibbs and Khalill's location. Jerrod denied knowing Gibbs.

Gibbs advised Jerrod that the police "ain't got shit" and that the police could not do anything. Jerrod replied that he had heard that the police had "just hit" the houses of two other 135 Piru gang members. Jerrod stated that the police had found "the thirty odd box," which, according to Detective Duncan, was a rifle. Jerrod said that "they took the gun" and that he had "seen the burner."

Jerrod then said that the police had searched his house for two hours and brought in a dog. Gibbs said that he was "fucked if they find that whooptie."

Jerrod reiterated that someone was "snitching." He denied doing anything or knowing anything.

Finally, Jerrod said that when the police arrived at his house, he ran to the back door and said, "'Poke, it's the police!'" Poke "took off running."

13

5. *Recorded telephone conversation between Khalill and "Fat Dog" on February 28, 2009*

During the conversation, Khalill asserted that "somebody's telling" and that the identity of the person would "come to light" during any court proceeding. Fat Dog asserted that the person who was talking to the police would not want to testify because "we're going to be in that court waiting."

6. *Recorded telephone conversations on March 3, 2009*

On March 3, 2009, at approximately 4:00 p.m., another stimulation was done in which members of the sheriff's department went to Wallace's residence and obtained his DNA sample. Wallace was told that the DNA sample was being obtained so that it could be compared to an expended casing at the scene of the 2001 homicide.

After the stimulation, at 4:38 p.m., Wallace called Khalill and told him to leave wherever he was because the police just "hit" him in Pasadena and took a DNA sample. Wallace stated that the police suspected that they had committed "that 2001 shit." Wallace further said that the police told him that they would obtain Khalill's DNA.

Wallace said that the police told him that his boat was "'sinking'" and that he was on "'borrowed time.'" Khalill said that things were "getting worse and worse."

At 5:36 p.m., Gibbs told Khalill that Wallace had just called him to tell him that the police had taken his DNA.

7. *Recorded telephone call between Wallace and his mother on March 3, 2009*

During a recorded telephone conversation, Wallace's mother told Wallace that if the police had enough evidence, they would have arrested him. Wallace said that the police were "workin' on it" and that the police were "gettin' ready" for a trial. Wallace advised his mother to call an attorney, tell the attorney that the police had taken his DNA, and that Wallace wanted to hire him.

14

8. *Recorded telephone conversation between Khalill and his mother on August 3, 2009*

Khalill told his mother that he had just been charged with two murders and was "tryin['] to just soak it all in." When Khalill's mother asked him if he was "even there," he responded that he had been "there," but that he did not know "what the fuck they [were] talkin' about." Khalill complained that people were "tryin['] to ruin [his] life."

D. YouTube Video of Khalill

As part of the investigation into the 135 Piru gang, Detective Duncan searched YouTube for any videos by the gang. During the search, Detective Duncan recognized Khalill in a video. The video had been placed on YouTube in 2007.

In the video, Khalill performed a rap song. At the start of the video, Khalill asks: "That kid on San Pedro?" Then, he adds that that person is "dead." Khalill then states that he could "back mine, or spray it out and stack mine." He said that he burned "trees like a torch" and that he "roll[ed] with gutless gunners" and "Glock cockers." Khalill says that there was "blood in the drain" and that "[n]o witness, no name equal no one to blame." He also states that "[d]ue to repercussions, neighbors scared to speak." At another point, Khalill says, "Welcome to my murder show." He adds: "One Glock, two pops, two drops." He concludes with: "a rider causing more casualties than Al Queda."**[10]**

E. Feissa's Proffer Interview and Proffer Agreement

In March 2009, Feissa was arrested and charged with burglary, narcotic sales, and gang conspiracy. In August 2009, Detective Valento conducted a proffer interview with Feissa and a prosecutor. As part of that procedure, Feissa entered into a proffer agreement, which promised that the information Feissa gave during the interview would not be used against him.

---

**[10]** According to Detective Duncan, a "rider" is someone who puts in work for the gang.

In the proffer interview, Feissa stated that on the night of Quezada's murder, Feissa told appellants that Quezada was not a member of the rival gang, Barrio 13. He also told Detective Valento: "'K-9 said that he's fitting to be gone for [the] rest of his life. He's about to be gone for the rest of his life.'" When Detective Valento asked Feissa what Khalill was referring to when he said that, Feissa answered, "'the little kid that got killed.'" Feissa indicated that sometimes he could not remember whether the information he received from Khalill was in person or on the telephone.

During the proffer interview, Feissa also said that, at some point, he got into Wallace's Chevy Tahoe and had a conversation with Wallace, who said that "it had to be done." Feissa believed that Wallace was referring to Quezada's murder.

Feissa was consistent that he spoke to Khalill and Gibbs about the murder. He was also consistent in reporting that Khalill and Wallace drove by and "saw a Sarrio slipping," that Khalill and Wallace returned to Khalill's house and "talked to the homeys," that appellants walked to Avalon Boulevard, that Khalill asked Quezada where he was from, that Khalill and Gibbs were the shooters and that Wallace was the lookout, that a nine-millimeter and a Desert Eagle 40 were used, that appellants ran back to Khalill's house, and that Wallace got into his Chevy Tahoe and drove away.

Approximately one month later, Feissa entered into a leniency agreement. Under the terms of the agreement, Feissa pled guilty to the charges against him and agreed to testify in appellants' case, as well as in Simpson and Prothro's case (for the Llanos murder). Feissa would remain in custody until the preliminary hearings in both cases had occurred. Feissa would not be sentenced until the conclusion of both trials, and the sentence would be left to the trial court's discretion.

Once Feissa was released from custody, he was relocated. In July 2011, he was arrested for the murder of Daveon Childs. Feissa received no leniency in that case. The parties stipulated that Feissa was guilty of the murder of Daveon Childs, who was killed in a drive-by shooting on January 3, 2008.

16

F.  Events Occurring After Feissa's Proffer Agreement

Appellants were arrested on July 31, 2009.  On that date, Detective Duncan looked at the cellular telephone recovered from Wallace and found a video from "L.A.'s Most Wanted" that had been aired as a stimulation.

Wallace's phone also had a photograph of Jerrod and Khalill.  In the photograph, Khalill and Jerrod appeared to be "throwing . . . gang signs."

In the contacts section of Wallace's phone were listings for "B Spoke," "Peanut," "K-9," and "Ethie" (Feissa's moniker).

G.  Gang Expert Testimony

Detective Duncan testified as a gang expert.  He opined that appellants, Jerrod, and Feissa were all members of the 135 Piru gang.  In August 2001, one rival of the Piru gang included the Nutty Block Crips.  Bickham was a legacy member of the Nutty Block Crips, as he was the son of a well-known Nutty Block gang member, Michael Tresvant.  Detective Duncan believed that it would have been "a pretty good score for a 135 Piru gang member to kill the son of Michael Tresvant."

In July 2008, the number one rival of the Piru 135 gang was the Barrio 13 gang.  Detective Duncan did not believe that Quezada was a member of the Barrio 13 gang.

According to Detective Duncan, gang members sometimes went on missions together.

In Detective Duncan's experience, people were reluctant to report gang crimes.  Thus, law enforcement commonly used informants to gain gang information and obtain information about a particular crime.  Informants sometimes got paid.  They were often gang members who had criminal histories.

The prosecutor gave Detective Duncan two hypotheticals based on the 2001 and 2008 murders.  He opined that both crimes were committed in association with a criminal street gang.

II. *Defense Evidence*

    A.  <u>Gibbs's Evidence</u>

        1.  *Jolon Gordon (Gordon)*

On July 25, 2008, at approximately 8:30 p.m., Gordon was near 139th Street and Avalon Boulevard to go to the mailbox for his mother. He had a clear view of the apartment across the street. As he approached the mailbox, he saw one male walking on Avalon Boulevard; he did not recognize the person. He also saw three people jaywalking at an angle across the street.

While Gordon was at the mailbox, a "[g]uy got shot." When Gordon heard the gunshots, he ducked behind the mailbox. While he was ducking behind the mailbox for approximately 12 seconds, he saw a black Toyota Camry drive by. The car was "burning rubber" and was going fast. Gordon also saw the three jaywalkers running back across the street.

One of the three jaywalkers looked at Gordon as he ran back across the street. Gordon got a good look at the person, who was a tall African-American male with braids.

Gordon was familiar with appellants from the neighborhood. He did not see them when the shooting occurred. He was "100 percent sure" that Khalill was not anyone he had seen on the night of the shooting. When he was interviewed by Detectives Gene Morse, Valento, and Duncan, he never mentioned Gibbs as being one of the people he had seen on the night of the shooting.

Gordon spoke to Detectives Valento and Duncan in 2011 in Texas. He was shown three photographic lineups. He identified Wallace as someone he recognized from the neighborhood, but not as someone he had seen on the night of the murder. He also recognized Khalill in one of the lineups.

Later, Gordon told detectives that if Khalill had been involved in the shooting, he (Gordon) would have said so. But he also told Detective Valento that he was nervous because Khalill knew "everything" about his family and that his family still lived in the area. He had no doubt that "the person," who the parties stipulated was Khalill, would retaliate.

In a later conversation between Gordon and Detective Morse, Gordon did not tell Detective Morse that he was too scared to identify Khalill or that he was afraid for his safety for being a snitch.

Appellants never threatened Gordon.

2. *Feissa*

On March 3, 2009, Detective John Duncan was working with Detective Ty Labbe in investigating the July 25, 2008, murder. They interviewed Feissa, who was in custody. During the interview, Feissa blamed someone named Matrell for logging onto his (Feissa's) home computer and accessing certain data, as well as handling a package. Detective Labbe believed that Feissa was lying.

Detective Labbe also accused Feissa of "'playing [law enforcement].'"

Detective Duncan believed that Feissa was being dishonest about whether he was a drug trafficker.

Detectives Duncan and Labbe learned that Feissa was a suspect in the murder of Daveon Childs. When they questioned him about his involvement, he lied and attempted to blame someone else for that murder.

After the interview with Feissa, Detective Labbe filled out a card indicating that Feissa was an unreliable informant. Detective Labbe explained that because there was a threat against Feissa and Detective Labbe could not control him, Feissa was a "liability." Also, Feissa was not truthful about his whereabouts or his activities. Although Detective Labbe completed a card indicating that Feissa was unreliable, that did not mean that he was being dishonest in regards to the information he provided in the Llanos murder or the Quezada murder.

In fact, the information provided in the Llanos and Quezada murder investigations was corroborated.

19

B.  Khalill's Evidence

          1. *Jackie Kidd (Kidd)*

Kidd, Khalill's aunt, testified that Khalill lived in Atlanta in the 1990's with his mother and father.  He did not move back to Los Angles until after October 13, 2001, and she could not recall a time prior to that date when he had visited Los Angeles.  (Kidd had not told law enforcement this information, even though she knew that Khalill had been arrested.

          2. *Feissa*

On July 29, 2008, at approximately 10:30 p.m., Deputy Greggory Campbell and his partner, Mark Antrim, conducted a traffic stop of a black Toyota Camry in which Feissa was a passenger.  Deputy Campbell detained the occupants of the vehicle.  While the occupants were being removed from the vehicle, Deputy Campbell discovered a loaded nine-millimeter handgun at Feissa's feet.  Feissa was arrested.  Deputy Campbell considered the weapons possession to be gang-related.  But, he did not believe that they were going to do a drive-by shooting because there were two females in the car.

Elvie Porter (Porter) was in custody in a case in which he was charged with attempted murder and a gang allegation.  Feissa and Porter were housed in adjoining cells.  At some point, Feissa threatened to testify falsely in Porter's case.  He told Porter that he had testified falsely in several other cases, including one involving K-9.  Feissa also mentioned that the detectives in the case made him read the murder books and that he had memorized them.

          3. *Martin Flores (Flores)*

Flores, a court-appointed gang expert, testified that if Quezada was writing graffiti on the walls in the neighborhood, it would be considered disrespectful to Barrio 13 and could result in the person being shot or killed.  He believed that it was "unheard of" for a gang member to kill the son of another gang member merely because he was the son of a

gang member.[11]  He was unaware of any conflict between Michael Tresvant and appellants.

In 2001, in urban low-income neighborhoods, Caprices and Impalas were popular cars among young people.  The Caprice was a popular car with gang members.

From 1999 to 2001, Taylor was "at peace" with Wallace.  Flores was unaware of any conflict between Khalill and either Taylor or Bickham.

When asked a hypothetical question similar to the facts of the Quezada murder, Flores opined that it was "less likely" that an older gang member would have committed the crime, and "more likely" that younger gang members would be committing such crimes.

Finally, Flores testified that he was familiar with cases in which an informant in a gang used his role as an informant to retaliate against certain gang members.  Because informants were given "incentives," they had a motive to lie against the gang.  Based on the information he had reviewed, Flores believed that Feissa "at one point was an active member from 135."

C.  Wallace's Evidence

Robert Shomer (Shomer), a psychologist who specializes in eyewitness identification, testified extensively that eyewitness identification is "the least reliable means of identification we have," even "under the very best conditions."  Even if a witness is "very confident," his identification could "not [be] accurate at all."

---

[11]     According to Flores, shooting Michael Tresvant's son would not have given anyone "bragging rights" because the son was not a documented gang member.

III. *Rebuttal Evidence*

    A.  <u>Detective Valento's Interviews with Gordon</u>

Detective Valento interviewed Gordon on several occasions. During an interview in August 2008, Gordon did not mention that he had seen three people running across the street. He did mention that he had seen a black Camry. Gordon said that he was unsure whether the Camry was involved in the shooting and that the occupants may have been trying to drive away from the area because they had heard the gunshots and were afraid.

In May 2011, Detective Valento flew to Texas to interview Gordon because Gordon had told Detective Morse that he had additional information regarding the murder. During the May 2011 interview, Gordon stated that he had seen three individuals walk across the street; then he heard gunshots and ducked behind a mailbox; then he saw the same three people running back in his direction. Gordon said that one of the three had stopped and looked at him. Gordon also said that he had seen a person walking down the street, but that that person was not responsible for the shooting.

Detective Valento showed Gordon some photographic lineups. When Detective Valento showed Gordon the photographic lineup containing Khalill's photograph, Gordon did not make any identifications. In another lineup containing Wallace's photograph, Gordon mentioned Wallace's gang moniker, but did not specifically identify Wallace's photograph. He did not identify Gibbs in a third photographic lineup.

After the interview, Gordon called Detective Valento and said that he had more information to disclose. Detective Valento asked Gordon if he had originally been reluctant to speak to detectives due to fear, and Gordon replied, "'Something like that, bro.'"

Detective Valento later interviewed Gordon in a car outside of Dallas. Gordon said that he recognized someone in one of the lineups, but that he was nervous to make an identification. Gordon stated that he recognized "K-9 from 135." He also said that Khalill knew Gordon and his family. And, Gordon stated that someone had thrown something at his vehicle, and when Gordon stopped and got out of his car, Khalill confronted him and said "'I know where you live.'"

Gordon called Khalill a "ringleader." When Detective Valento asked if Gordon meant that Khalill was a "shot-caller," Gordon agreed that that was a better description. Khalill's position in the gang was one reason why Gordon was fearful of retaliation.

B. Search of Feissa's Computer

At some point, Feissa's computer was searched. On the computer was a photograph of Llanos, with his face crossed out; the number 135 appeared below the face. Feissa was in jail at the time Llanos was murdered.

Feissa told Detective Valento that Simpson used the paint brush function on the computer to cross out the photograph of Llanos. Simpson was subsequently convicted of murdering Llanos.

Feissa's computer also contained a photograph of a hand holding a handgun. The weapon appeared to be a "small caliber handgun, probably .380 or [a] .25 auto."

**DISCUSSION**

I. *The trial court did not err in denying the severance motions*

Gibbs argues that the trial court erred in denying his motion to sever count one from the other counts.[12]

Section 954 permits the joinder of "'two or more different offenses of the same class of crimes or offenses.'" (*People v. Myles* (2012) 53 Cal.4th 1181, 1200; see also *People v. McKinnon* (2011) 52 Cal.4th 610, 630.) "The law favors the joinder of counts because such a course of action promotes efficiency." (*People v. Myles*, *supra*, at p. 1200.)

---

[12] Below, Wallace filed a motion to sever his case from that of his codefendants; that motion was also denied by the trial court. On appeal, Wallace joins in the argument raised by Gibbs. But, Wallace's "reliance solely on [Gibbs's] arguments and reasoning is insufficient to satisfy his burden" of showing error and prejudice. (*People v. Nero* (2010) 181 Cal.App.4th 504, 510, fn. 11.) After all, their positions are completely different— Gibbs argues that count one should have been severed from the trial; Wallace argued that his case should have been severed from that of his codefendants. Because Wallace raised a different claim in the trial court, and because that claim is governed by a different test than the one raised by Gibbs on appeal (*People v. Homick* (2012) 55 Cal.4th 816, 848), Wallace's contention fails.

23

Here, counts one through three were of the same class of crimes or offenses because they alleged murder and attempted murder.  (*People v. Thomas* (2011) 52 Cal.4th 336, 350; *People v. Soper* (2009) 45 Cal.4th 759, 771.)  Thus, the statutory requirements of joinder were met.

When the statutory requirements for joinder are satisfied, a trial court has the discretion to sever the counts; however, "there must be a 'clear showing of prejudice to establish that the trial court abused its discretion in denying the defendant's severance motion.'"  (*People v. Myles*, *supra*, 53 Cal.4th at p. 1200.)  An abuse of discretion occurs when the ruling by the trial court exceeds the bounds of reason.  (*People v. Hartsch* (2010) 49 Cal.4th 472, 493.)

A refusal to sever charges may be an abuse of discretion when:  (1) evidence on the charges would not be cross-admissible in separate trials; (2) certain charges are likely to inflame the jury against the defendant; (3) a weak case is joined with a strong case, or two weak cases are joined together; and (4) any of the charges carries the death penalty or the joinder of them turns the matter into a capital case.  (*People v. Myles*, *supra*, 53 Cal.4th at p. 1201.)

Here, some of the evidence related to the wiretapped recordings would have been cross-admissible if the charges based on the 2001 murder and attempted murder had been tried separately from the 2008 murder charge.  For example, many of the recorded telephone calls showed a connection among all three appellants or a connection between Wallace and Khalill.  Because the evidence was cross-admissible, that alone was sufficient for the trial court to refuse to sever the charged offenses.  (*People v. Hartsch*, *supra*, 49 Cal.4th at p. 493; *People v. Soper*, *supra*, 45 Cal.4th at pp. 774–775.)

Even if the evidence were not cross-admissible, other factors confirm that the trial court did not abuse its discretion in rejecting Gibbs's severance motion.  Because the charges related to the 2001 and 2008 incidents both involved senseless and unprovoked murders, one was not more likely to inflame the jury than the other.  (*People v. Soper*, *supra*, 45 Cal.4th at p. 780.)  If anything, the 2008 murder was more offensive than the 2001 incident because the 2001 incident involved a drive-by shooting, in which Bickham

was killed and gunshots were fired at Taylor, whereas the 2008 incident involved numerous gunshots fired at Quezada while he was on the ground. Although Gibbs argues that the gang evidence related to the 2001 crime was unduly inflammatory, this evidence "paled in comparison to the evidence of the most prejudicial facet" of the 2008 murder— "its absolute senselessness," its utter brutality, and the extreme amount of overkill. (*People v. McKinnon*, *supra*, 52 Cal.4th at p. 631.) Thus, there was little likelihood that the joinder of the charges would inflame the jury.

Contrary to Gibbs's assertion, the evidence related to the 2008 murder was not weak compared to the evidence of the 2001 charges. The 2001 charges were supported by the testimony of Taylor, who identified Khalill and Wallace as being involved in the crimes, as well as evidence that the police found ammunition at Wallace's house that was the same caliber as casings found at the murder scene. The 2008 charge was supported by Feissa's testimony. The recorded telephone conversations further established the connection among appellants.

Although Gibbs claims that the evidence related to the 2008 murder was weak because it relied on Feissa's testimony, Feissa's background actually buttressed his testimony because it supported an inference that he would have had access to appellants and that they would have been willing to make incriminating statements to him. Even if the 2001 evidence may have appeared somewhat stronger than the 2008 evidence at the time of the severance motion, "the salient point is that the proffered evidence was sufficiently strong in both cases." (*People v. Soper*, *supra*, 45 Cal.4th at p. 781.) Moreover, the evidence related to the 2001 charges and the evidence related to the 2008 murder were sufficiently distinct "as to render the likelihood of prejudice minimal." (*People v. Mendoza* (2000) 24 Cal.4th 130, 162.) In light of these factors, there is little likelihood that the jury was improperly influenced by evidence of one murder in determining guilty on the other.

Notably, "it [is] always . . . possible to point to individual aspects of one case and argue that one is stronger than the other." (*People v. Soper*, *supra*, 45 Cal.4th at p. 781.) "A mere imbalance in the evidence, however, will not indicate a risk of prejudicial

25

'spillover effect,' militating against the benefits of joinder and warranting severance of properly joined charges." (*Ibid*.) "Furthermore, the benefits of joinder are not outweighed—and severance is not required—merely because properly joined charges might make it more difficult for a defendant to avoid conviction compared with his or her chances were the charges to be separately tried." (*Ibid*.)

Gibbs further argues that the denial of his severance motion resulted in a due process violation. We are not convinced.

"Even if a trial court's severance of joinder ruling is correct at the time it was made, a reviewing court must reverse the judgment if the 'defendant shows that joinder actually resulted in "gross unfairness" amounting to a denial of due process.'" (*People v. Mendoza*, *supra*, 24 Cal.4th at p. 162; see also *People v. Myles*, *supra*, 53 Cal.4th at p. 1202.) Here, there was no due process violation.

First, the evidence related to the 2001 offenses and the evidence relating to the 2008 murder were "simple and distinct." (*People v. Soper*, *supra*, 45 Cal.4th at p. 784.) Thus, the jury would have been able to "compartmentalize the evidence presented in the two cases," thereby insuring that there would be "no improper spillover effect" or gross unfairness by the joinder of the charges. (*Ibid*.)

Second, the separate nature of the 2001 offenses and 2008 murder was highlighted by the prosecutor and the trial court. For example, the prosecutor made clear during opening statement that count one (the murder of Quezada) was "charged against all three defendants," while counts two and three (relating to the murder of Bickham and the attempted murder of Taylor) applied "only to defendants Wallace and Khalill." The prosecutor reiterated that counts two and three "do not pertain to defendant Gibbs. I want to be clear about that." The trial court also emphasized that Gibbs was not charged in counts two and three, noting, after Taylor's testimony, that Gibbs was "not charged in this offense, is not suspected in his offense," and that "nothing regarding the testimony of this witness or the allegations on this case are to be used against Mr. Gibbs for any purpose."

Moreover, the trial court instructed the jury that "[a]ll three defendants are charged in count 1," which involved the murder of Quezada, but that only Khalill and Wallace were charged in counts two and three. The trial court also instructed the jury that it "must separately consider the evidence as it applie[d] to each defendant" and that it "must decide each charge for each defendant separately." And, the trial court instructed the jury that Wallace and Khalill, but not Gibbs, were charged with the special circumstance of having been convicted of more than one murder in this case. The statements by the prosecutor and the trial court instructions "mitigated the risk of any prejudicial spillover." (*People v. Soper*, *supra*, 45 Cal.4th at p. 784.)

Citing *U.S. v. Bradley* (9th Cir. 1993) 5 F.3d 1317 (*Bradley*) and *Bean v. Calderon* (9th Cir. 1998) 163 F.3d 1073 (*Bean*), Gibbs contends that the jury would have disregarded the instructions. However, decisions by federal courts are not binding on this court. (*People v. Beltran* (2013) 56 Cal.4th 935, 953.) And, Gibbs failed to provide any evidence to overcome the presumption that the jurors followed the trial court's instructions. (*People v. Racklin* (2011) 195 Cal.App.4th 872, 877.)

In any event, the two cases are distinguishable. *Bradley* did not involve a severance motion. (*Bradley*, *supra*, 5 F.3d at pp. 1319–1321.) And, in that case, the challenged evidence showed a propensity for violent crime and became the focus of latter stages of trial and the prosecutor's closing argument. (*Id*. at p. 1322.) In contrast, the evidence here related to two distinct incidents and the instructions made clear that Gibbs was not charged in connection with the 2001 crimes.

Likewise, *Bean* is inapposite. In that case, the defendant moved to sever two cases in which he was charged. The prosecutor urged the jury to consider evidence of the defendant's modus operandi to determine the defendant's guilt in both cases and the instructions given only stated that each count charged a distinct offense and had to be decided separately. (*Bean*, *supra*, 163 F.3d at pp. 1083–1084.) In contrast, here it was made clear by both the prosecutor and the trial court's instructions that only count one applied to Gibbs.

27

Gibbs's reliance upon *People v. Albarran* (2007) 149 Cal.App.4th 214 is also misplaced. That case did not involve a severance motion; instead, it considered the admission of gang evidence that was deemed irrelevant to the charges. (*Id*. at pp. 227–228.)

Finally, for the same reasons already discussed, a more favorable result for Gibbs was not reasonably probable even if count one had been tried separately from counts two and three. (*People v. Tafoya* (2007) 42 Cal.4th 147, 162.) Accordingly, we conclude that the trial court did not err in denying Gibbs's severance motion.

II. *The trial court properly admitted Feissa's preliminary hearing testimony*

Gibbs and Khalill argue that the trial court erred by admitting Feissa's preliminary hearing testimony.[13]

A.  Events at the preliminary hearing

Prior to the preliminary hearing, Khalill's attorney told the trial court that there was "uncharged conduct on behalf of [Feissa] regarding [a] shooting incident." The prosecutor stated that there was "a pending investigation" into the matter. Khalill's attorney responded that he needed the information because Feissa was an informant and the information might relate to "motive and biases and those kind[s] of things."

Wallace's counsel then noted that Feissa was "apparently making deals to testify against [appellants] in return for something from the prosecutor for a case that he has pending." He opined that "this might be one of those incidents" and that Feissa was "testifying not only in this case but in other cases." Wallace's attorney then informed the trial court that Wallace did not want to "waive any more time." He suggested that the information on Feissa be "flushed] out some other time."

---

**13**    Wallace attempts to join in their arguments. However, his "reliance solely on [Gibbs's and Khalill's] arguments and reasoning is insufficient to satisfy his burden" of showing error and prejudice. (*People v. Nero*, *supra*, 181 Cal.App.4th at p. 510, fn. 11.) Unlike Gibbs and Khalill, Wallace decided not to cross-examine Feissa during the preliminary hearing. Thus, their arguments do not necessarily establish error or prejudice in his case.

The trial court declared a recess until the following morning and requested that Gibbs and Khalill's attorneys determine whether they wanted to proceed with the preliminary hearing or conduct a hearing into the investigation of Feissa.

The next day, Khalill's counsel stated that he was requesting "all of the information" law enforcement had regarding the incident in which Feissa was a suspect. Counsel argued that the information was relevant to Feissa's "potential bias and/or motive to cooperate with the police." Gibbs and Wallace joined in the request.

The trial court denied the motion, finding that the attorneys could cross-examine Feissa on bias and "prior investigation." The preliminary hearing then began. Feissa was called as a witness.

### 1. *Cross-examination by Khalill*

Feissa admitted that he had spoken with the police about this case "[a] few" times; the conversations were always recorded.

He testified that he had a criminal case involving a burglary. Under a leniency agreement, Feissa would be sentenced after trial, but would be released from custody after testifying at the preliminary hearing. He was facing prison time for the crimes and was "scared of prison."

Feissa further testified that he wanted to go home as soon as he could.[14] At first he stated that he was facing "a couple of years" in state prison due to his plea, but then eventually admitted that he was facing five to seven years.[15]

Khalill's attorney then asked Feissa if he had been convicted in a narcotics case. Feissa replied that he had, that he went to court in March 2008, and that he pled guilty in a marijuana case. He said that he was told by the prosecutor that the crime would be a misdemeanor if he did community service. Feissa promised to do the community service.

---

[14] The magistrate did not allow defense counsel to pose questions about whether Feissa wanted to be in jail during the summer, asking counsel to "move through this."

[15] The magistrate stopped questions about whether seven years was more than two years, commenting that he did not want to "waste time" and did not want any "drama."

When Khalill's attorney pushed questions about whether Feissa "gave [his] word," the trial court sustained the prosecutor's objections on relevance grounds; the trial court also found the question to be argumentative. Khalill's attorney did ask Feissa whether he had performed the community service; he replied that he did not.

Khalill's attorney was allowed to ask Feissa whether he was having problems with his memory. He admitted that he did not "remember things," and he admitted that he had told someone that he forgot things as a result of past drug use.[16]

Feissa invoked his Fifth Amendment privilege when asked questions about a murder and two attempted murders that had occurred on Tarrant Street (the Tarrant Street murder) and when asked whether there were any other criminal investigations pending.

Feissa testified that he was paid for information he provided in this case, but he did not recall the amount; the trial court sustained an objection to questions about whether he was paid in cash and whether he was going to pay taxes on those monies.

Feissa was not present during the 2008 murder and had not been a witness to it. His knowledge was limited to what Khalill, Gibbs, and others had told him. He denied that he was giving information to the police to get out of jail.

Throughout his questioning of Feissa, Khalill's attorney repeatedly argued with the trial court, contending that he was not being allowed to cross-examine Feissa meaningfully.

### 2. *Cross-examination by Gibbs*

Feissa testified that he joined the 135 Piru gang in 2006, but he was no longer in the gang. Gibbs was a member of the gang, and Feissa had talked to him in the past.

Feissa stated that he had "hit . . . up" Quezada once in front of Quezada's house. Feissa knew it was dangerous to hit up Quezada while in another gang's territory.

On July 28, 2008, Feissa was at home. He went to Khalill's house at night at some point after the murder. While there, Feissa also talked to Gibbs.

---

[16] The trial court did not allow questions about which drugs he had used and the length of drug use.

Feissa had smoked a "[c]ouple of blunts" of marijuana that day, one in the morning and one in the evening. Feissa said that they did not make him high.

Feissa used cocaine before he went to jail. Although he did not know the date that he last used cocaine, he did not use cocaine on the day of the murder.

He received money for information on this case.

The proffer agreement required Feissa to be truthful. If he lied or someone thought he was lying, the deal would "go away."

Later, Feissa testified that he drove a car in 2008. When asked what type of car he had been driving, Feissa initially invoked the Fifth Amendment. Later, he answered that he did not own a car, but he drove a white 2001 Volkswagen Jetta.

Feissa testified that he was familiar with the area of 139th Street and Avalon Boulevard. There was a mailbox on the northwest corner and, if a person was standing at that mailbox, he could see the location where the murder occurred on July 28, 2008.

Feissa testified that Gibbs told him that he walked across Avalon Boulevard to shoot Quezada. He ran away after the shooting and went to Khalill's house.

Gibbs told Feissa about the murder while he was at a pool party. Gibbs, Feissa, and Jerrod were in the backyard when Feissa asked Gibbs about the murder. Although Gibbs said that a "nine and 40" were used in the murder, Feissa admitted that he told the police that one of the guns was a Desert Eagle.[17] He believed what Gibbs said about the incident.

Feissa asserted the Fifth Amendment when asked if he had to put in work for the gang.

Feissa was given a Toyota Tercel by Detective Shaw. Sheriff's deputies would let Feissa go if they pulled him over.

---

[17]  Gibbs did not mention the Desert Eagle to Feissa. And later, Feissa testified that he did not know what kind of guns were used in the shooting of Quezada. But, he had been told that the two most common weapons that the 135 Piru gang used were the nine-millimeter and the Desert Eagle.

31

### 3. *Cross-examination by Wallace*

Wallace did not cross-examine Feissa.

### 4. *Further cross-examination by Khalill*

Feissa testified that he was not given an unmarked police car to drive. He had told the police that the first name of Peanut was Trayvon or Laquon. He also told them that Khalill did not say that he had shot anyone. Feissa was not close to anyone in the 135 Piru gang, but he did not tell the police that.

After Feissa received money from Detective Shaw, Feissa continued to "hang[] around" the neighborhood. He never smoked PCP. In 2008, he had a fist fight with someone in the 135 Piru gang.

### 5. *Further cross-examination by Gibbs*

Since high school, Feissa had arguments with Gibbs.

### B. Events at trial

Prior to trial, the prosecutor moved to admit Feissa's preliminary hearing testimony because Feissa was unavailable (Evid. Code, §§ 240, 1291). In the motion, the prosecutor stated that she anticipated that Feissa would assert his Fifth Amendment rights if called to testify in appellants' case.

The prosecutor argued that at the time of the preliminary hearing, Feissa had been in custody on two counts of second degree burglary, one count of transporting a controlled substance, and one count of criminal street gang conspiracy. Pursuant to a "leniency agreement," Feissa pled guilty to the charges and testified at the preliminary hearing in this matter, as well as in a preliminary hearing in a case against Prothro and Simpson. Feissa's sentence for his case would be determined by the trial court and could range from time served to seven years. Prior to entering into the leniency agreement, Feissa gave a "'Proffer Interview,' which necessitated a 'proffer agreement' granting him protection against his proffer statements being used against him." The prosecutor further asserted that, pursuant to the leniency agreement, Feissa had been released on his own recognizance after his testimony at the preliminary hearing and had relocated out of state.

32

The prosecutor then pointed out that on July 7, 2011, Feissa had been charged with the Tarrant Street murder. Feissa's case also involved "relevant gun and gang allegations," such as section 186.22. The prosecutor argued that, in light of the pending charges against Feissa, she reasonably anticipated that he would assert his Fifth Amendment privilege if called to testify. After all, "[a]ny testimony by Feissa" in appellants' case regarding statements made to him by appellants would be "incriminating to Feissa because it [would] demonstrate[] his membership and status level within the 135 Piru criminal street gang."

Prior to trial, the court held a hearing. The prosecutor called Feissa, who invoked his Fifth Amendment rights and refused to answer the prosecutor's questions. After taking judicial notice of the fact that Feissa was being prosecuted for murder and that there was a section 186.22 allegation the trial court sustained Feissa's assertion of his Fifth Amendment privilege.

The prosecutor then asked Feissa if he intended to invoke his Fifth Amendment privilege to any questions about Quezada's murder. He replied, "Yes."

Feissa also invoked the Fifth Amendment when Gibbs's attorney asked him questions about whether he knew or recognized Gibbs, whether he had signed a document in which the Los Angeles Sheriff's Department had found him an unreliable informant, or had any conversations with Gibbs. Gibbs's attorney argued that Feissa's invocation of the Fifth Amendment was "inappropriate" and that Feissa should be directed to answer the questions because they did not relate to any charges against him. Wallace and Khalill joined in Gibbs's argument.

Feissa's attorney argued that anything Feissa said about any relationship he had with appellants would potentially incriminate him in his pending case because the case involved gang allegations. The trial court sustained Feissa's assertion of privilege.

In response to questions from Khalill's attorney about whether he grew up on the streets of Compton, whether he received money from the sheriff's department, the shooting on Tarrant Street, receipt of leniency, and whether he knew Khalill, Feissa again

33

asserted the Fifth Amendment. Khalill's counsel objected. The trial court sustained Feissa's invocation of the Fifth Amendment to each question.

Based upon what had transpired, Wallace's attorney elected not to cross-examine Feissa. The prosecutor had no further questions.

After hearing argument from counsel, the trial court found that Feissa was unavailable due to the assertion of his Fifth Amendment privilege. It found that he had legitimately invoked the Fifth Amendment to the questions asked. It also determined that, after reviewing the preliminary hearing transcript, appellants had had the opportunity to "fully cross-examine" Feissa at the preliminary hearing. Thus, his preliminary hearing testimony could be read to the jury.

With respect to due process, the trial court noted that appellants had the right to attack Feissa's credibility with information that was "not within the four corners of the preliminary hearing transcript." In other words, if the defense had any documents or witnesses that "would shed light" on Feissa's credibility, they could "bring it on." Likewise, if there was information that "on prior occasions [he had] admitted to being untruthful, that [he had] given false testimony, or that [he had] engaged in other criminal conduct [that was] not addressed within the four corners of the preliminary hearing transcript," the defense would be allowed to admit such evidence. Later, the trial court reiterated that it was going to allow the defense to "use other collateral impeachment within the scope of [Evidence Code section] 352" to impeach Feissa and as not limiting them solely to the impeachment that occurred during the preliminary hearing.

Later in the proceedings, the trial court warned defense counsel that they would be "really limited on the Tarrant Street murder as far as what information" they sought to admit. But, it was not, and would not, preclude the defense from impeaching Feissa "on other bad crimes . . . or prior convictions involving moral turpitude, et cetera." The trial court agreed that the defense was allowed to admit evidence of various instances in which Feissa had lied and the knowledge of the police that Feissa had lied.

C.  Appellants had an adequate opportunity to cross-examine Feissa at the preliminary hearing

"Although defendants generally have the right to confront their accusers at trial, this right is not absolute." (*People v. Seijas* (2005) 36 Cal.4th 291, 303; *People v. Harris* (2005) 37 Cal.4th 310, 332.)  "'If a witness is unavailable a trial and has testified at a previous judicial proceeding against the same defendant and was subject to cross-examination by that defendant, the previous testimony may be admitted at trial.'" (*People v. Seijas*, *supra*, at p. 303; see also *People v. Harris*, *supra*, at p. 332; Evid. Code, § 1291.)

"To admit prior testimony of an unavailable witness, the party against whom it is offered . . . must not only have had the *opportunity* to cross-examine the witness at the previous hearing, he must also have had 'an interest and motive similar to that which he has at the [subsequent] hearing.'" (*People v. Smith* (2003) 30 Cal.4th 581, 611; *People v. Harris*, *supra*, 37 Cal.4th at pp. 332–333.)  "[I]t is the opportunity and motive to cross-examine that matters, not the actual cross-examination." (*People v. Smith*, *supra*, at p. 611.)

Here, appellants had an adequate opportunity to cross-examine Feissa.  They were allowed to question him about a variety of topics related to his credibility and his possible motives to be untruthful, including the leniency agreement he had entered into, his fear of being incarcerated and the length of the sentence he was facing, his failure to complete community service in another case, his memory problems and whether those problems were caused by drug usage, the fact that he had been arrested when he decided to give information to the police about the Quezada murder, the money he had received for giving information to law enforcement, his membership in the 135 Piru gang, his concession that he had "hit . . . up" Quezada prior to Quezada's murder, the type of car he drove in July 2008, and the fact that he had not been present during the 2008 murder.

The restrictions on the questioning imposed by the magistrate primarily related to redundant questioning on matters already covered or questioning on irrelevant or minor topics.  For example, the magistrate refused questions regarding whether Feissa wanted to

be incarcerated in the summer, whether seven years in state prison was more than two years in state prison, whether seven years in state prison was a long time, whether Feissa had told a judge that he would do community service, the reasons why Feissa had not completed his community service and why he believed that there had been a probation violation hearing, the type of drugs Feissa had ingested that led to his memory problems and the length of that drug use, whether he gave the police information on another homicide case, and whether he was paid in cash for the information he provided to law enforcement and whether he paid taxes on that money. Thus, the magistrate imposed only minor limitations during the cross-examination of Feissa; he did not unduly restrict appellants' ability to fully cross-examine him. (*People v. Valencia* (2008) 43 Cal.4th 268, 294.)

Moreover, at trial, the trial court allowed the defense to attack Feissa's credibility with information that was "not within the four corners of the preliminary hearing transcript." As a result, appellants presented testimony to the jury that two detectives believed that Feissa had been untruthful in a number of situations, including lying about his lack of involvement in the murder of Daveon Childs. The defense also presented evidence that Feissa threatened to testify falsely in Porter's trial; that Feissa had stated that he had testified falsely in other trials, including a trial involving someone named K-9; and that Feissa claimed that he had read the murder books in appellants' case and had memorized them. The jury also learned that Feissa sometimes attempted to blame other people to divert suspicion from himself and that he was involved in an incident with Llanos prior to Llanos's murder.[18] Finally, the defense presented evidence that Feissa had been arrested on July 29, 2008, in a black Camry after a loaded nine-millimeter

---

[18] The jury also heard that Feissa had given information in the Llanos case and had received $7,250 for that information.

36

handgun was found at his feet.[19] Thus, the jury heard substantial evidence related to Feissa's credibility and his possible involvement in Quezada's murder.

In sum, appellants "undertook a thorough and effective cross-examination" of Feissa and were able to comprehensively question him about his motives to testify falsely and about factors that affected his credibility. (*People v. Hollinquest* (2010) 190 Cal.App.4th 1534, 1549.) Appellants were also allowed to impeach Feissa's credibility through evidence that had not been presented at the preliminary hearing. As such, the trial court did not err or violate appellants' constitutional rights in admitting the preliminary hearing transcript. (*People v. Valencia*, *supra*, 43 Cal.4th at p. 294.)

Khalill's reliance upon *Davis v. Alaska* (1974) 415 U.S. 308 (*Davis*), *People v. Brock* (1985) 38 Cal.3d 180 (*Brock*), and *Smith v. Illinois* (1968) 390 U.S. 129 (*Smith*) is misplaced. In *Davis*, the defendant was allowed only a limited cross-examination of the witness (*Davis*, *supra*, at p. 318); in contrast, as set forth above, appellants were allowed to extensively cross-examine Feissa about his credibility and motives. In *Brock*, the preliminary hearing examination of a witness occurred in a hospital room because the witness had been hospitalized for terminal diseases; during the examination, he was on a number of medications and showed signs of discomfort, disorientation, and confusion. (*Brock*, *supra*, at pp. 191–192.) Contrariwise, here, appellants engaged in an extensive cross-examination of Feissa, and Feissa was not unable to answer the questions. Finally, in *Smith*, the defendant was unable to question a witness about his true name and the location of his residence. (*Smith*, *supra*, at pp. 130–131.) Here, the defense was able to question Feissa about topics that impacted his credibility and motives for identifying appellants as the individuals who committed the Quezada murder.

---

[19] Gordon testified that he saw a black Toyota Camry drive by when Quezada was shot.

D.  Feissa's infrequent invocation of his Fifth Amendment rights did not prevent appellants from an adequate opportunity to cross-examine him

Gibbs and Khalill argue that Feissa's invocation of his Fifth Amendment rights at the preliminary hearing prevented them from having an adequate opportunity to cross-examine Feissa; therefore, his preliminary hearing testimony should have been stricken.

"It is a bedrock principle of American (and California) law, embedded in various state and federal constitutional and statutory provisions, that witnesses may not be compelled to incriminate themselves." (*People v. Seijas*, *supra*, 36 Cal.4th at p. 304; see also *People v. Williams* (2008) 43 Cal.4th 584, 613.)  "'To invoke the privilege, a witness need not be guilty of any offense; rather, the privilege is properly invoked whenever the witness's answers "would furnish a link in the chain of evidence needed to prosecute" the witness for a criminal offense.'" (*People v. Williams*, *supra*, at pp. 613–614.)  "A witness may assert the privilege who has 'reasonable cause to apprehend danger from a direct answer.'" (*People v. Seijas*, *supra*, at p. 304; see also *People v. Williams*, *supra*, at p. 614.)  "'To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result.'" (*People v. Seijas*, *supra*, at p. 304; accord *People v. Williams*, *supra*, at p. 614.)

A witness's refusal to answer questions based on his right against self-incrimination may curtail a party's ability to adequately cross-examine that witness. (*People v. Seminoff* (2008) 159 Cal.App.4th 518, 525.)  Courts "have recognized that striking a witness's entire testimony is a drastic solution and that there are alternatives when the witness has refused to answer one or two questions on cross-examination on matters that are collateral, such as credibility." (*People v. Sanders* (2010) 189 Cal.App.4th 543, 556; see also *People v. Seminoff*, *supra*, at pp. 525–526.)  "In sum, there is solid support, both judicial and scholarly, for the proposition that when one or two questions asked during cross-examination are at stake and those questions relate to a collateral matter such as the nonparty witness's credibility, the trial court need not strike

38

the entirety of that witness's direct testimony." (*People v. Sanders*, *supra,* at p. 556; accord *People v. Seminoff*, *supra,* at p. 527.)

Here, striking Feissa's preliminary hearing testimony was not required because the questions only related to collateral matters. For example, Feissa asserted his Fifth Amendment privilege to questions related to the police investigation of Feissa's possible involvement in the Tarrant Street murder, a case unrelated to the one against appellants. Feissa also invoked the privilege when asked whether he had put in work for the gang. He also invoked the Fifth Amendment privilege when asked about the type of car he drove in 2008. While this question might have related to whether Feissa was involved in Quezada's murder, he subsequently answered the question.[20] Because all of the questions Feissa refused to answer related to collateral matters, the trial court did not err in refusing to strike all of his preliminary hearing testimony. For the same reason, appellants' ability to cross-examine Feissa was not curtailed.[21]

Khalill urges reversal pursuant to *Lawson v. Murray* (4th Cir. 1988) 837 F.2d 653 (*Lawson*). As previously set forth, decisions of the federal district or appellate courts are not binding on state courts. (*People v. Racklin*, *supra*, 195 Cal.App.4th at p. 877.) In any event, that case is distinguishable. In *Lawson*, the defense witness who invoked the Fifth Amendment "was clearly attempting to say just enough to exonerate" the defendant "without implicating himself," and was, thus, "trifling with the truth" on matters that

---

[20] And, during trial, the defense presented evidence that Feissa had been arrested on July 29, 2009, in a black Toyota Camry after a loaded nine-millimeter handgun was found at his feet.

[21] It follows that *People v. Hathcock* (1973) 8 Cal.3d 599 is distinguishable. In that case, the witness asserted the Fifth Amendment privilege to questions asking her to "repudiate specific portions of her prior testimony relating to defendant's participation in the crime." (*Id*. at p. 616.) Collateral matters were not at stake. (*Ibid*.) And, in any event, the Court of Appeal did not reach the merits of the question of whether her refusal to answer these questions was proper as it found the issue forfeited on appeal. (*Ibid*.)

were "so relevant and pertinent." (*Lawson*, *supra,* at p. 656.) In contrast, Feissa only invoked the privilege to questions on collateral matters.

E. The motion for new trial was properly denied

After appellants were convicted, Gibbs filed a motion for new trial asserting that his constitutional rights had been violated when Feissa's preliminary hearing testimony was read to the jury. Wallace and Khalill joined in Gibbs's motion. The trial court denied the motion. On appeal, Khalill argues that the trial court erred because the prosecution made Feissa an unavailable witness by charging him with the murder of Daveon Childs.

We review the trial court's order for abuse of discretion. (*People v. Lightsey* (2012) 54 Cal.4th 668, 729.)

Under Evidence Code section 240, subdivision (b), "[a] declarant is not available as a witness if the exemption, preclusion, disqualification, death, inability, or absence of the declarant was brought about by the procurement or wrongdoing of the proponent of his or her statement for the purpose of preventing the declarant from attending or testifying." (See *People v. Hollinquest*, *supra*, 190 Cal.App.4th at p. 1551.) To establish a violation of a defendant's confrontation rights due to misconduct by the prosecutor that resulted in the unavailability of a witness, the defendant must prove three elements: (1) the prosecutorial misconduct "was entirely unnecessary to the proper performance of the prosecutor's duties and was of such a nature as to transform" a "witness willing to testify into one unwilling to testify"; (2) "the prosecutor's misconduct was a substantial cause in depriving the defendant of the witness's testimony"; and (3) the testimony the defendant was unable to present was material to his defense.[22] (*People v. Hollinquest*, *supra*, at p. 1552.)

---

[22] Because Khalill is asserting that the prosecutor procured Feissa's absence, *People v. Roldan* (2012) 205 Cal.App.4th 969 does not apply. In that case, the prosecutor did nothing to prevent the victim from being deported. (*Id*. at pp. 976–985.)

Here, the trial court did not abuse its discretion in denying the motion for new trial because appellants have not provided any evidence that the prosecutor had an improper motive or otherwise engaged in misconduct that resulted in Feissa's assertion of his privilege against self-incrimination. Although Khalill argues that the prosecution should have granted immunity to Feissa, delayed charging him, or held his trial more quickly, there is no evidence that the prosecutor acted improperly. The prosecution is not obligated to confer immunity to a witness. (*People v. Williams*, *supra*, 43 Cal.4th at p. 622; *People v. Hollinquest*, *supra*, 190 Cal.App.4th at p. 1551.) There is no evidence that the prosecution purposely delayed the start of trial until after Feissa was charged in the Daveon Childs case. And, there is nothing in the appellate record indicating that the prosecution intentionally made Feissa unavailable for trial. "In the absence of any evidence" of improper motive or misconduct, appellants have failed to establish that "the prosecutor acted with the specific objective of preventing the witness from testifying within the meaning of [Evidence Code] section 240, subdivision (b)" or that she violated appellants' confrontation rights. (*People v. Hollinquest*, *supra*, 190 Cal.App.4th at p. 1553.) Thus, the trial court properly denied appellants' motion for new trial.

III. *The trial court did not abuse its discretion in refusing to allow Gibbs to play Feissa's entire recorded statement*

Gibbs contends that the trial court erred when it refused to allow him to play a 42-minute recording of an interview of Feissa by law enforcement.[23]

A. Relevant facts and proceedings

During the trial, the trial court told Gibbs that it was "disinclined" to allow him to "play the entire transcript" of an interview with Feissa because "much of it [was] not relevant to the issues in the case." The trial court stated that it would allow the defense to

---

[23] Again, Wallace joins in Gibbs's argument. In the trial court, Wallace noted that he "would just like to hear Mr. Feissa's voice, to put voice to the transcript," but he did not join in Gibbs's motion to play the entire recorded interview. The failure to join in a motion of a codefendant constitutes a waiver of the issue on appeal. (*People v. Wilson* (2008) 44 Cal.4th 758, 793.)

"call whatever witnesses" were necessary "to establish whether or not on a prior occasion Mr. Feissa lied to law enforcement." But, the trial court found issues related to another murder and "a lot of other things" in the recording irrelevant.

Gibbs responded that Feissa had been "deemed to be a confidential, reliable informant," but that detectives "throughout the course of that 42-minute interview," brought up "various" incidents in which they accused Feissa of lying or "being disingenuous."

The trial court reiterated that the defense could call witnesses and ask if Feissa had lied and, if so, how he had lied. However, the trial court would not allow the defense "to play a 40-minute tape for the purposes of being able to try and have the jury figure out how in effect this guy lied."

Later, the trial court stated again that defense counsel could "ask the investigator any of those questions [relating to Feissa's honesty]." The trial court added that if there were "specific portions" of the tape that involved a statement by Feissa that was "untruthful," then it would allow counsel to play those portions of the tape. But, "the entirety of the tape involves a number of subjects that aren't relevant to the trial." Thus, under Evidence Code section 352, while the defense could "address any issues that [were] prior inconsistent statements or [related to Feissa's] bad character," it could not play the entire tape.

B. <u>Analysis</u>

"Under Evidence Code section 352, a trial court has 'broad power to control the presentation of proposed impeachment evidence ""to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues." [Citation.]'" [Citation.]' [Citation.]" (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1089–1090; see also *People v. Harris* (2008) 43 Cal.4th 1269, 1291.) """"Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance.' [Citation.]" [Citations.]' [Citation.]" (*People v. Mendoza*, *supra*, at p. 1090; see also *People v. Harris*, *supra*, at p. 1292.) "A trial court's exercise of discretion under

42

[Evidence Code] section 352 will be upheld on appeal unless the court abused its discretion, that is, unless it exercised its discretion in an arbitrary, capricious, or patently absurd manner." (*People v. Thomas* (2012) 53 Cal.4th 771, 806.)

With these principles in mind, we conclude that the trial court did not abuse its discretion in disallowing Gibbs from playing the entire 42-minute taped interview of Feissa. The trial court apparently listened to the entire recording or read a transcript and concluded that the 42-minute interview contained a number of issues that were not relevant to appellants' case or to Feissa's credibility. Gibbs has not presented anything to contradict the trial court's conclusion.

Moreover, the trial court specifically allowed Gibbs to present portions of the tape-recorded interview involving untruthful statements by Feissa, but counsel chose not to do so. The trial court also allowed the defense to present witnesses to establish that Feissa had been untruthful. Under these circumstances, although hearing Feissa's "manner of speaking" during the interview "might have assisted the jury in determining credibility, the trial court acted well within its discretion in precluding the defense" from playing the entire taped interview. (*People v. Avila* (2006) 38 Cal.4th 491, 592.)

Even if the trial court had erred, reversal is not required because any alleged error was harmless. (*People v. Boyette* (2002) 29 Cal.4th 381, 428.) The application of ordinary rules of evidence, such as Evidence Code section 352, does not generally infringe on a defendant's constitutional rights. (*People v. Boyette, supra,* at pp. 427–428.) While the complete exclusion of defense evidence could rise to the level of a constitutional violation, that is not what occurred here. And, the exclusion of evidence on a minor or subsidiary point does not infringe on a defendant's right to present a defense. (*People v. Boyette*, at p. 428.)

And, a different result was not reasonably probable. Substantial evidence was submitted to impeach Feissa's credibility, including Detective Labbe's conclusion that Feissa was unreliable, the two detectives' belief that Feissa had been untruthful on a number of occasions, Feissa's threat to testify falsely in Porter's case, and Feissa's statement that he had testified falsely in trials. Although Gibbs contends that the jury's

43

request for a readback of Feissa's testimony indicates that it was struggling with that testimony, such a conclusion is merely speculative and could just "as easily [have been] reconciled with the jury's conscientious performance of its civic duty." (*People v. Houston* (2005) 130 Cal.App.4th 279, 301.) It follows that any alleged error was harmless and does not compel reversal.

IV. *The trial court did not abuse its discretion in denying the motion for mistrial*

Gibbs contends that the trial court erred when it denied his motion for a mistrial after a detective testified that Feissa's information led to a conviction in another murder case.[24]

A. Relevant facts and proceedings

During the prosecution's case-in-chief, Detective Valento testified that Feissa had information on two murders that he was investigating: the murder of Quezada and the murder of Llanos. Prior to the information from Feissa, the murder of Llanos was unsolved.

During a sidebar discussion, Gibbs's attorney argued that the information regarding the Llanos murder was not relevant. The prosecutor argued that there had already been a "great attack" on Feissa as being unreliable and that Feissa had been "paid an absurd amount of money for being an informant." Thus, she wanted to counteract the defense effort with evidence that Feissa helped to solve "an additional homicide," resulting in convictions. The prosecutor believed that the evidence would show that Feissa was reliable.

The prosecutor then stated that she did not intend to spend a "lot of time on that murder" and could "streamline" the evidence by showing that Feissa's information "resulted in a conviction." The prosecutor noted that Feissa did not even testify in the other case, which established that other evidence corroborated Feissa's information.

---

[24]    Again, Wallace attempts to join this argument. At the risk of sounding redundant, his "reliance solely on [Gibbs's] arguments and reasoning is insufficient to satisfy his burden" of showing error and prejudice. (*People v. Nero*, *supra*, 181 Cal.App.4th at p. 510, fn. 11.)

Wallace's counsel then objected to the evidence, arguing that there were a "lot of so-called reliable informants that have succeeded in obtaining convictions for the People, who [have] later . . . been reversed." He asserted that the proffered evidence did not establish that Feissa was reliable. Gibbs's attorney joined in the objection.

Pursuant to Evidence Code section 352, the trial court excluded evidence regarding the conviction in the other case. While the evidence might be relevant in rebuttal, it was not relevant in the prosecution's case-in-chief.

During direct examination of Detective Valento, the prosecutor asked about the arrest of the defendants in the Llanos case. He responded: "The driver, Marcellous Prothro, was arrested on July 31, 2009. The shooter, alleged shooter at the time, now convicted, was the passenger in that vehicle, which—."

Gibbs's attorney objected and moved to strike the answer. During a sidebar discussion, Gibbs's attorney asserted that what had happened was "just what the court stated should not happen." Counsel moved for a mistrial.

After hearing argument from the prosecutor, the trial court denied the motion. Back in front of the jury, the trial court stated: "With regards to the last portion of the answer that the witness gave as to whether or not a conviction occurred in some other case, that's stricken as being irrelevant to the issues in this case."

Gibbs subsequently called Detective Duncan as a witness. He had interviewed Feissa on March 3, 2009, while Feissa was in custody. Gibbs's attorney attempted to show that Detective Duncan believed that Feissa had been untruthful during that interview. He was examined about an affidavit in another matter in which he stated that he was unaware of any gang member confidential informants who provided "'100 percent truthful information.'" He conceded that an in-custody gang member informant had a motive to lie or give false information.

During cross-examination by Khalill, Detective Duncan testified that Feissa had denied being involved in the murder of Daveon Childs and denied being a drug trafficker between California and Texas.

45

During cross-examination by the prosecutor, Detective Duncan stated that the information Feissa provided in the Llanos murder had been corroborated. When she asked if the case had resulted in a conviction, Detective Duncan replied affirmatively. Defense counsel did not object.

During recross-examination, Khalill's attorney asked: "You said that basically, Mr. Feissa's information about the Juan Llanos case led to a conviction, essentially?" Detective Duncan replied, "I believe so, yes." He then testified that Feissa did not testify at that trial. He denied looking at Feissa as a suspect in the Llanos case, but said that investigators "did things to make sure he wasn't pawning that murder off on someone else."

The prosecutor then called Detective Valento as a rebuttal witness. After he verified that Feissa had identified suspects in the Llanos case, he testified that other witnesses corroborated Feissa's identifications. The prosecutor then asked if the trial resulted in a conviction, and Khalill's attorney objected. The trial court overruled the objection, but Detective Valento did not answer the question.

B. Analysis

"""A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction.""" (*People v. Dement* (2011) 53 Cal.4th 1, 39; see also *People v. Collins* (2010) 49 Cal.4th 175, 198.) """Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.""" (*People v. Dement*, *supra*, at pp. 39–40; see also *People v. Collins*, *supra,* at p. 198.) A mistrial motion should be granted when a defendant's """chances of receiving a fair trial have been irreparably damaged.""" (*Ibid*.)

Here, the trial court did not abuse its discretion in determining that Detective Valento's volunteered statement did not result in incurable prejudice necessitating a new

trial.[25]  His comment about the conviction in the Llanos case was "brief and isolated." (*People v. Dement*, *supra*, 53 Cal.4th at p. 40.)  The isolated reference was "easily cured by striking the evidence and admonishing the jury to disregard it."  (*People v. Leavel* (2012) 203 Cal.App.4th 823, 825.)  We presume that the jury followed the trial court's admonishment, and Gibbs has not rebutted that presumption.  (*Ibid.*)  It follows that the trial court acted well within its discretion in denying the motion for mistrial.[26]

V.  *The admission of Feissa's testimony was not improper merely because he was an informant*

Appellants argue that their constitutional rights were violated by the admission of Feissa's testimony because he was an "inherently unreliable" informant.  As Gibbs acknowledges, the California Supreme Court has repeatedly rejected such claims.  (See, e.g., *People v. Hovarter* (2008) 44 Cal.4th 983, 997; *People v. Jenkins* (2000) 22 Cal.4th 900, 1007–1008; *People v. Ramos* (1997) 15 Cal.4th 1133, 1165.)  We therefore deny this contention.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Khalill takes it one step further—he claims that because Feissa's testimony was inherently unreliable, it did not constitute sufficient evidence.  This argument fails as well.  When a claim of insufficient evidence is raised, the appellate court reviews the entire record in the light most favorable to the judgment to determine whether there was reasonable and credible evidence from which a trier of fact could find a defendant guilty beyond a reasonable doubt.  (*People v. Lee* (2011) 51 Cal.4th 620, 632.)  In making this

---

[25]  Although Gibbs asserts that the prosecutor committed misconduct, the appellate record does not support such a conclusion.  The prosecutor did not attempt to elicit inadmissible evidence in violation of a court order; and the record does not show that she failed to control her witness.  The prosecutor merely asked about the arrests of the defendants in the Llanos case, and the detective nonresponsively mentioned the conviction.  Thus, there was no prosecutorial misconduct.  (*People v. Collins*, *supra*, 49 Cal.4th at pp. 196–199.)

[26]  And, we acknowledge that Detective Duncan subsequently testified, without objection, that the Llanos case resulted in a conviction, a point reiterated during cross-examination by Khalill.

determination, the reviewing court presumes in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*Ibid*.) "'[E]ven testimony which is subject to justifiable suspicion do[es] not justify the reversal of a judgment, for it is the exclusive province of the . . . jury to determine the credibility of a witness.'" (*Ibid*.) In other words, we do not resolve issues of credibility. (*Ibid*.)

Here, the jury heard a variety of factors affecting Feissa's credibility and determined his testimony to be credible. We cannot, and will not, reassess his credibility.

## VI. *Alleged prosecutorial misconduct*

Khalill contends that the prosecutor committed misconduct by using a puzzle analogy during closing argument.[27]

### A. Relevant facts

Both before and after the presentation of evidence, the trial court instructed the jury with CALCRIM No. 220, which states that a criminal defendant is "presumed to be innocent" and that the prosecution has the burden of proving each defendant guilty "beyond a reasonable doubt." The instruction explains that "[p]roof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt." The instruction further cautions that "[u]nless the evidence proves the defendants guilty beyond a reasonable doubt, they are entitled to an acquittal and you must find them not guilty."

The trial court also instructed the jury with CALCRIM No. 200, which provides: "You must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."

The trial court further instructed the jury with CALCRIM No. 222: "Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence."

---

[27]     Gibbs joins in this argument.

During the closing argument, the prosecutor stated: "Ladies and gentlemen, jury trials, and the evidence is sort of like a puzzle. We give you all the pieces . . . through witnesses, through exhibits. And your job as a juror is to put them together and determine if you can see the picture on the front of the box. [¶] So because jury trials are a combination of human beings and not a science project or [a] math problem, it's not like buying a new Jigsaw puzzle, where all the pieces are there. [¶] It's like buying a Jigsaw puzzle at a garage sale, where you get it home, and maybe some of the pieces are missing. Or a dog chewed on one piece, so it doesn't fit anywhere, or there's marinara sauce on another piece. [¶] But at the end of the day, even though that Jigsaw puzzle isn't brand new, the question is, can you see the picture on the front of the box. Is it a hot air balloon with kittens in it, or whatever it may be."

The prosecutor then discussed the evidence in the case and the law, and applied the evidence to the law.

She concluded with the following: "And that at the end of the day, when you add up all the pieces, when you put that Jigsaw puzzle together, and you add everything up in totality and look at it in its whole, it is clear to you that those defendants are guilty as charged, and responsible for the murders that they are charged with."

B. Forfeiture

A prosecutor's conduct violates the federal Constitution if his actions so infect the trial with unfairness that it results in a denial of due process. (*People v. Whalen* (2013) 56 Cal.4th 1, 52; *People v. Thompson* (2010) 49 Cal.4th 79, 120.) If the conduct is below this level, it violates California law if it involves the use of "deceptive or reprehensible methods" to persuade the jury. (*People v. Whalen*, *supra*, at p. 52; *People v. Thompson*, *supra*, at p. 120.)

To preserve a claim of prosecutorial misconduct, a defendant must make a timely objection to the alleged misconduct and ask the trial court to admonish the jury, unless an admonishment would not have cured the harm. (*People v. Whalen*, *supra*, 56 Cal.4th at p. 52; *People v. Thompson*, *supra*, 49 Cal.4th at pp. 120–121.)

49

Here, as Khalill concedes, there was no objection to the prosecutor's allegedly improper statements. Thus, he has forfeited on appeal any claim of misconduct. (*People v. Houston* (2012) 54 Cal.4th 1186, 1223.)

C. Even if appellants had not forfeited this argument on appeal, it still fails because the prosecutor's comments were not improper

Even if this argument had not been forfeited on appeal, it still fails. It is misconduct for a prosecutor to misstate the law and to absolve the prosecution from its duty to prove its case beyond a reasonable doubt. (*People v. Boyette*, *supra*, 29 Cal.4th at p. 435; *People v. Marshall* (1996) 13 Cal.4th 799, 831.) Khalill contends that, under *People v. Katzenberger* (2009) 178 Cal.App.4th 1260 (*Katzenberger*) and *People v. Otero* (2012) 210 Cal.App.4th 865 (*Otero*), the prosecutor misstated the reasonable doubt standard by using a puzzle analogy. We are not convinced. In both of those cases, the prosecutor used a Power Point presentation as a visual aid to explain reasonable doubt. (*Katzenberger, supra*, at p. 1264; *Otero*, *supra*, at p. 873.) That is a far cry from the simple jigsaw puzzle analogy employed by the prosecutor here. And, unlike the prosecutor in *Katzenberger* and *Otero*, she certainly did not suggest that the reasonable doubt standard could be based upon a few pieces of evidence or by a quantitative measurement of evidence. (*Katzenberger*, at p. 1264; *Otero*, at p. 873.)

Even if the prosecutor committed misconduct, reversal would not be required because any misconduct was harmless. (*Katzenberger*, *supra*, 178 Cal.App.4th at p. 1269.) As set forth above, the evidence against appellants was strong. And, the jury was instructed on the reasonable doubt standard and was told that it must follow the trial court's instructions, including if the attorneys' comments on the law conflicted with the trial court's instructions. We presume the jury followed the trial court's instructions. (*People v. Anzalone* (2013) 56 Cal.4th 545, 557.)

VII. *The trial court properly discharged Juror No. 6*

Khalill contends that the trial court improperly discharged Juror No. 6. Khalill and Wallace forfeited this claim. Even on the merits, this claim must be rejected because the trial court properly discharged Juror No. 6; she had a scheduled vacation.

50

A. Relevant facts and proceedings

During the middle of trial, on Friday, December 16, 2011, the trial court received a note from Juror No. 6, which indicated that the juror had "travel plans," namely to depart for Connecticut on December 18, 2011. The juror stated that she had not mentioned the travel plans during the "'hardship segment'" of jury selection because the flight had not been booked at that time. The juror booked the flight after learning that the trial "would go through December 16th" and that the court calendar indicated that it would be "'dark'" after that. The juror purchased a "'low cost ticket'" on November 30, 2011, and stated that it would cost her at least $100 to change her ticket or purchase a new one.

When the trial court asked the parties how they wanted to address the issue of Juror No. 6's vacation plans, Gibbs's and Khalill's counsel responded that they did not know.

The trial court deferred the issue until later in the day, when it became clearer whether they were going to be able to close evidence that day.

In the presence of the jury, the trial court told Juror No. 6 that it had received her note and intended to address it later that day. The trial court then informed the jury that the "best-case scenario" was that the evidence portion of the case would conclude that day, but that the "worst-case scenario" was that the evidence presentation would end on Monday. It asked the jurors to assume the "worst-case scenario" and wanted to know whether any jurors had a scheduling conflict.

Juror No. 4 stated that he was planning to go on a family vacation from December 21, 2011, through December 30, 2011. But, he had made "back-up plans" and could meet his family later.

In the afternoon of December 16, 2011, the trial court held an additional proceeding regarding Juror No. 6. During a sidebar discussion, Juror No. 6 stated that she had checked into flights for "late Wednesday [December 21, 2011] evening" and Thursday (December 22, 2011); both flights would cost her additional monies. When asked about whether it was possible to take the Thursday flight, Juror No. 6 stated that it

was "a lot of money" that she would prefer not to spend. However, if the trial court wanted her to book the Thursday flight, she would comply.

The trial court asked Juror No. 6 to "stick it out," especially since the trial had lasted "almost three weeks." She replied that she would, since she wanted "to see it to the outcome." The attorneys did not have any questions for her.

The trial court decided to keep the juror because she was "still willing to serve." No one objected.

After jury instructions on Monday, December 19, 2011, the trial court asked Juror No. 6 if she was able to reschedule her flight. She said that she had obtained a ticket for a flight on Thursday morning at 1:00 a.m. Juror No. 4 stated that his flight was the same day as Juror No. 6's flight and would be able to return whenever he needed to do so.

The trial court told the jurors to "meet and confer" and "[g]o over scheduling" because it did not want the jury to "feel rushed to reach a verdict." It instructed the jury that it wanted it to "carefully consider the evidence." It stated that if the jury had not reached a verdict by Wednesday evening, it needed to know what day the jury would be able to return and continue deliberations. The trial court was willing to consider having the jury return after the New Year's Day, rather than the week between Christmas and New Year's Day. The trial court added: "I don't want you to feel like you've got a deadline, and you've got to rush to meet that deadline. Okay?"

Wallace's attorney requested that the two jurors be replaced with alternate jurors or that closing argument not be done until January 2012. Gibbs's attorney joined in the argument. The trial court denied their request.

The trial court then stated that the jury might be able to reach a verdict before breaking for the holidays. It noted that it would not "penalize the jurors by not allowing them to spend time with their family members during the holidays." It then stated that it could authorize a "short break" and that the jury could return to deliberate "the week after Christmas."

Wallace's attorney then stated that there were two alternate jurors and two jurors that had scheduled vacations. He requested that the trial court "substitute the alternates in, have them continue to deliberate." Again the trial court denied Wallace's request.

On Tuesday, December 20, 2011, the trial court stated that it had researched the issue regarding the possible continuation of jury deliberations and, pursuant to *People v. Santamaria* (1991) 229 Cal.App.3d 269 (*Santamaria*), concluded that it could not put the matter over until after the first of the year.

Wallace's attorney then stated that he was "not too thrilled about the alternates" available. But, he added: "No other choice but to sub them in if we release two jurors. And we go with those twelve, and hope that they survive." Khalill's attorney agreed, stating: "I don't like any of the choices, really." Gibbs's attorney agreed with Wallace's counsel.

The trial court decided to clarify the vacation schedules of Juror Nos. 4 and 6. During a sidebar discussion, Juror No. 6 said that she would return on December 29, 2011. Juror No. 4 stated that he was scheduled to leave on Thursday (December 22, 2011) and would return at any time from his trip. When asked if he would be able to leave later in the week, Juror No. 4 replied that he wanted to leave by "Friday morning" (December 23, 2011) at the latest.

After closing argument, the trial court indicated that it was considering releasing Juror No. 6 because if the jury did not "reach a verdict by the close of business tomorrow [Wednesday]," then the jury would have to begin deliberations anew, which would be a "horrible waste of time." The trial court believed that it was "incredibly unlikely" that the jury would reach a verdict by the next day due to the "extent of the testimony in the case and the number of exhibits." It asked if there was a request that Juror No. 6 be replaced with an alternate juror.

Gibbs's attorney stated that he had no such request because he believed that it was possible for the jury to reach a verdict on the 2008 murder by the next day. Thus, he wanted Juror No. 6 to remain.

53

Wallace's attorney requested that Juror No. 6 be replaced with an alternate because he believed the possibility of the jury reaching a verdict by the next day was "slim," he did not want there to be a "waste," and he did not want to cause "more problems with the jurors to start all over."

Khalill's attorney indicated that he was "not making a request." When asked if he was opposed to replacing Juror No. 6, he replied that he was "ambivalent."

The trial court found that there was "a manifest need to release Juror Number 6" due to "the scheduling conflict she alerted us to a long time ago." It had expected a consent to a recess during the holidays. Since it could not force the parties to agree to a recess, the trial court believed that it would constitute reversible error to recess the case for such a length of time. Thus, it decided to replace Juror No. 6 with an alternate.

Gibbs's attorney objected.

The trial court then excused Juror No. 6, and she was replaced with an alternate. On December 22, 2011, the jury reached verdicts.

B. Forfeiture

A defendant may properly raise an argument regarding the allegedly improper discharge of a juror only if he raised the issue in the trial court. (*People v. Lucas* (1995) 12 Cal.4th 415, 488.) "'The requirement of a contemporaneous and specific objection promotes the fair and correct resolution of a claim of error both at trial and on appeal, and thereby furthers the interests of reliability and finality.'" (*Id*. at pp. 488–489.)

On two occasions, Wallace specifically requested that Juror No. 6 be replaced with an alternate. Because Wallace supported the trial court's decision to discharge Juror No. 6 and replace her with an alternate, he has forfeited any claim that the trial court erred in discharging that juror. (*People v. Lucas*, *supra*, 12 Cal.4th at pp. 488–489.)

Khalill also forfeited any claim regarding the allegedly erroneous discharge of Juror No. 6. In response to the trial court's question regarding whether there was a request that Juror No. 6 be replaced with an alternate, Khalill's attorney initially stated that he was "not making a request." The trial court attempted to clarify Khalill's position by asking defense counsel if he was opposed to replacing Juror No. 6 with an alternate.

54

Khalill's attorney replied that he was "ambivalent" about replacing the juror. Because he did not specifically object to the discharge of Juror No. 6, he has forfeited any contention that the trial court erred in doing so. (*People v. Lucas*, *supra*, 12 Cal.4th at pp. 488–489.)

C. The trial court properly discharged Juror No. 6

Even on the merits, the claim fails. "A juror may be discharged if, at any time before or after final submission of the case, the court upon good cause finds the juror 'unable to perform his or her duty.'" (*People v. Virgil* (2011) 51 Cal.4th 1210, 1242; see also § 1089; *People v. Zamudio* (2008) 43 Cal.4th 327, 349.) A trial court's decision to discharge a juror is upheld if there is substantial evidence to support the trial court's ruling and the juror's inability to perform appears on the record as a demonstrable reality. (*People v. Virgil*, *supra,* at p. 1242; *People v. Zamudio*, *supra*, at p. 349.)

With these principles in mind, we conclude that the trial court did not err in discharging Juror No. 6. The record establishes that she had airline tickets for a flight at 1:00 a.m. on Thursday, December 22, 2011, which meant the last day that she was available to deliberate was Wednesday, December 21, 2011. As the trial court reasonably noted, the jurors would not begin to deliberate until December 20, 2011, and, due to the amount of evidence that had been presented and the nature of the charges, it was highly unlikely that the jurors would be able to reach verdicts before Juror No. 6's scheduled flight. Because the record amply supports the trial court's conclusion that Juror No. 6 would not be able to perform her duties as a juror, the discharge of Juror No. 6 was not erroneous.[28]

Khalill argues that the trial court treated Juror No. 6 in a "disparate manner" from Juror No. 4, who was "almost identically situated." However, they were not in the same position—Juror No. 4 indicated that he could leave for his vacation as late as Friday morning, which meant that he was available for deliberations through December 22,

---

[28] For the first time on appeal, Khalill argues that the trial court's discharge of Juror No. 6 violated the Jury Management Benchbook. This is not legal authority. Regardless, this belated contention is forfeited. (*People v. Lucas*, *supra*, 12 Cal.4th at pp. 488–489.) Regardless, Juror No. 6 was physically unable to serve as a juror.

2011.  Because Juror No. 4 was available for a longer period, the trial court could reasonably have concluded that it was possible for the jurors to reach verdicts by that point.

Khalill also contends that the trial court could have suspended the proceedings to allow the jurors to enjoy the holidays.  In *People v. Bolden* (2002) 29 Cal.4th 515, 561–562, the California Supreme Court held that the trial court in that case did not abuse its discretion in suspending deliberations for four court days during the winter holidays.  However, in that case, the defense did not object to the suspension of deliberations.  (*Id.* at p. 561; see also *People v. Johnson* (1993) 19 Cal.App.4th 778, 790–793.)  Here, Wallace requested that Juror Nos. 4 and 6 be replaced with alternates rather than breaking for the holidays.  Under such circumstances, *People v. Bolden* does not dictate that the trial court was required to suspend deliberations rather than discharge Juror No. 6.

Finally, Khalill contends that the trial court improperly relied on *Santamaria*, *supra*, 229 Cal.App.3d 269 in determining that a suspension for the holidays was inappropriate.  As the trial court noted, *Santamaria* was not directly on point because it involved a suspension of proceedings due to the trial court's planned absence.  (*Santamaria*, *supra*, at p. 278.)  But, it was reasonable for the trial court to rely on the case because, like Wallace here, at least one of the parties in *Santamaria* indicated opposition to the suspension of proceedings.  (*Ibid*.)

VIII.  *No cumulative prejudice*

Appellants contend that the foregoing alleged errors resulted in cumulative prejudice.  In light of our conclusion that none of the asserted claims of error is meritorious, there was no cumulative prejudice.  (*People v. Homick* (2012) 55 Cal.4th 816, 869.)

IX. *Wallace's motion to discharge his retained attorney was untimely*

Wallace argues that the trial court erred in denying his request to discharge his retained counsel.

A. <u>Relevant facts and proceedings</u>

On April 13, 2012, almost four months after appellants were convicted by the jury, the trial court received a letter from Wallace stating that he would be filing a motion for a new trial on the grounds of ineffective assistance of counsel. Wallace delineated nine instances of alleged ineffectiveness. He requested that another attorney be appointed to investigate and file a motion for new trial.

On June 20, 2012, Wallace's attorney filed a notice of motion to declare conflict of interest by counsel.

In response to the motions, the trial court stated that it would ascertain whether Wallace's attorney would declare a conflict and whether it was satisfied that there was a sufficient showing to grant withdrawal "at this point in the proceedings, given the fact that this is a post-trial motion."

After Wallace's attorney stated that he was declaring a conflict, the trial court held an in camera proceeding. During the proceeding, the trial court stated that it had "concerns about the timing of the declaration of a conflict . . . given the fact that it's occurred after a very long and protracted trial."

Wallace's attorney agreed that such a motion was "unusual at this stage of the proceedings." He confirmed that there had been a breakdown in communication between them, and he believed that he could not continue in the case. In addition, counsel represented that there was a difference of opinion regarding tactical issues and motions. And, the attorney was retained counsel; because the family was not willing to continue to pay for his services, he could not continue to represent Wallace. But, in response to the trial court's query, counsel did state, in spite of the alleged conflict, that he could represent Wallace's best interests.

When asked whether he had contacted another attorney, Wallace indicated that he was still looking for the right one—"[m]aybe a few weeks" or "[m]aybe less."

After the in camera hearing, the trial court asked the prosecutor what the potential impact would be if Wallace's counsel was permitted to withdraw and new counsel was appointed or retained. She stated that there were "at least six boxes" and several notebooks that were approximately four inches thick that contained discovery. Moreover, there was a wiretap that lasted more than a year and that collected "thousands and thousands of calls." Thus, she believed it would be "quite a cumbersome task" for a new attorney to "get up to speed on this case." She estimated that it would take at least six months to a year for another attorney to be adequately prepared. Wallace's attorney agreed that a minimum of six months would be needed for a new attorney to be adequately prepared.

Thereafter, the trial court denied the motions, noting that it had taken time to research the issue because the case was "very serious" and Wallace's right to counsel was "significant"; it did not want to "just have a knee-jerk reaction to the motion." After conducting legal research, the trial court concluded that it had the discretion to deny an untimely motion. It also found no conflict of interest based upon Wallace's failure to communicate with counsel and the family's refusal to pay. Because (1) counsel was "capable of continuing in the case and competently representing" Wallace; (2) terminating counsel at this late stage of the proceedings would cause "tremendous prejudice to the orderly administration of justice"; (3) it would take a competent attorney "close to a year" to prepare for the proceedings that remained in the case; and (4) the "timing of the request for termination of the attorney" had been "dilatory," the trial court denied Wallace's motion to discharge counsel and counsel's motion regarding the alleged conflict.

B. Analysis

"The right to retained counsel of choice is—subject to certain limitations— guaranteed under the Sixth Amendment to the federal Constitution." (*People v. Verdugo* (2010) 50 Cal.4th 263, 310.) However, the right to discharge retained counsel is not absolute. (*Id*. at p. 311.) A trial court has the discretion to deny a motion to discharge retained counsel if the discharge will result in """"significant prejudice"""" to the defendant

58

or if the motion is untimely in that it would disrupt ""'the orderly processes of justice.""" (*Ibid.*)

Here, the trial court did not abuse its discretion in denying Wallace's motion as untimely. He filed his letter nearly four months after he was convicted by the jury. By that point, Wallace's attorney had already filed a motion for new trial and a motion to unseal the jurors' contact information.

Moreover, as the trial court noted, there was a voluminous amount of information that a newly appointed or retained attorney would need to review in order to determine what motions to file or what steps to take.[29] Although Wallace contends that all of the information would not necessarily need to be reviewed and that the trial record could be reviewed in about a week and a half, based on the six-month to one year estimates provided by the prosecutor and Wallace's trial counsel, the trial court reasonably concluded that a new attorney would need substantial time to become appropriately familiar with the case; the six months to a year required would have significantly disrupted the orderly process of justice. (*People v. Verdugo*, *supra*, 50 Cal.4th at p. 311.) This conclusion is particularly true given the fact that Wallace had not even hired a new attorney at the time of the hearing and estimated that it would take several weeks to do so.

Wallace claims that any disruption to the proceedings could have been "mitigated" or "eliminated" if the trial court had held a hearing on his motion when he filed his letter. But, given the amount of time that it would have taken a new attorney to become familiar with the case (compounded by the fact that he still had not yet hired a new attorney), the delay in holding the hearing does not establish that the trial court abused its discretion in determining that granting Wallace's request would have resulted in a significant disruption of the proceedings.

---

[29] Wallace contends that all of the wiretap evidence would not need to be reviewed because "a new attorney could simply ask his client about the relevant facts." But that assumes that Wallace would be aware of all of the relevant facts and that counsel would be competent in merely accepting his client's assessment of the relevant facts.

Wallace's reliance upon *People v. Munoz* (2006) 138 Cal.App.4th 860 and *People v. Ortiz* (1990) 51 Cal.3d 975, 987 is misplaced. In both of those cases, the trial courts erroneously required the defendants to establish, under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*) that the attorney was providing inadequate representation or that the defendants and their attorneys were involved in an irreconcilable conflict. (*People v. Ortiz*, *supra*, at pp. 979–980, 987; *People v. Munoz*, *supra*, at pp. 864–866.) In contrast, the trial court here understood that Wallace was not required to make the showing specified in *Marsden*. Moreover, the *Ortiz* court found that the defendant's motion was timely because it was made "after the mistrial and well before any second trial" (*People v. Ortiz*, at p. 987); and the *Munoz* court found that the motion was timely because the trial had only lasted two days, the case was not complicated, and it was unlikely a new attorney would need a significant amount of time to become familiar with the case (*People v. Munoz*, at pp. 868, 870). Contrariwise, this case involved two murders and an attempted murder and there was a voluminous amount of information that a new attorney would have to review in order to become familiar with the case and make tactical decisions.

X. *Wallace's claim regarding the lack of a* Marsden-*like hearing*

Wallace contends that the trial court erred when it failed to hold a *Marsden*-like hearing on his motion to discharge his retained attorney because it was based on the alleged ineffectiveness of that attorney.

Preliminarily, we hold that Wallace forfeited this claim on appeal. He never objected when the trial court declined to hold a *Marsden*-like hearing, never requested such a hearing, and acquiesced in the procedure adopted by the trial court. (*People v. Braxton* (2004) 34 Cal.4th 798, 813–814; *People v. Jones* (2012) 210 Cal.App.4th 355, 361–362.)

Even on the merits, the claim fails. The California Supreme Court has held that, when counsel is retained, it is inappropriate to hold a *Marsden*-type hearing. (*People v. Ortiz*, *supra*, 51 Cal.3d at p. 984.) Thus, the trial court did not err in failing to hold such a hearing. (*People v. Hernandez* (2006) 139 Cal.App.4th 101, 108–109.) And, as

Wallace concedes, there is no legal authority to support his contention that a *Marsden*-type hearing should be required in situations in which a defendant makes an untimely motion to discharge his retained counsel and bases his motion on the alleged ineffectiveness of his attorney.

In support of his claim, Wallace directs us to *People v. Frierson* (1979) 25 Cal.3d 142 and *People v. Smith* (1993) 6 Cal.4th 684. These cases do not aid Wallace as neither involves the question of whether *Marsden*-like hearings are required for untimely motions to discharge retained counsel.

To the extent Wallace contends that the right to the effective assistance of counsel cannot be adequately protected if a *Marsden*-like hearing is not mandatory, he could have raised that argument on appeal had he argued ineffective assistance of counsel (which he did not); or, he can make this assertion in a habeas petition.

XI. *The trial court properly sentenced Wallace to two terms of life without the possibility of parole*

Wallace contends that he could only receive one sentence of life without the possibility of parole because the multiple murder special circumstance could only apply to one of the murders he committed.

The California Supreme Court has held that when the prosecution alleges more than one multiple murder special circumstance, and the jury in a capital case finds more than one of those circumstances to be true, all but one of the findings should be stricken. (*People v. Danks* (2004) 32 Cal.4th 269, 315.) Here, the prosecutor did not charge more than one multiple murder special circumstance, and the jury made only one multiple special circumstance finding. Thus, no finding on a multiple murder special circumstance needs to be stricken.

Moreover, it was proper for the trial court to impose sentences of life without the possibility of parole for counts one and two. Although the multiple murder special circumstance can be alleged and found true only once in a case, it may be used to impose multiple sentences of life without parole in a single proceeding. (*People v. DeSimone*

(1998) 62 Cal.App.4th 693, 701; *People v. Garnica* (1994) 29 Cal.App.4th 1558, 1563–1564.)

XII. *The trial court properly imposed 10-year gang enhancements on counts one and two, but improperly imposed it on count three*

Wallace contends that the trial court erred in imposing 10-year gang enhancements on counts one through three instead of sentencing him to a 15-year minimum parole eligibility on those counts. The People concede that he is correct and that the trial court should have imposed the 15-year minimum parole eligibility on count three (attempted murder) only.

Under section 186.22, subdivision (b)(1)(C), a prison term of 10 years "shall" be imposed on a defendant convicted of committing a gang-related felony. However, section 186.22, subdivision (b)(5), provides that "any person who violates this subdivision in the commission of a felony punishable by imprisonment in the state prison for life, shall not be paroled until a minimum of 15 calendar years have been served."

Courts have held that "[w]here, as here, a defendant is sentenced to an indeterminate life term for attempted murder, the 15-year parole eligibility provision of section 186.22, subdivision (b)(5) applies rather than the 10-year gang enhancement. [Citation.]" (*People v. Arauz* (2012) 210 Cal.App.4th 1394, 1404–1405; see also *People v. Campos* (2011) 196 Cal.App.4th 438, 447.) Thus, Wallace and Khalill should have received the 15-year minimum parole eligibility term for count three (attempted murder). As such, the 10-year sentence enhancement imposed against Wallace and Khalill for count three is stricken and the trial court is instructed to replace it with the 15-year minimum parole eligibility term. (*People v. Arauz*, *supra*, at pp. 1404–1405; *People v. Campos*, *supra*, at p. 447.) Gibbs too is entitled to the 15-year minimum term for his sentence on count one, since he received a sentence of 25 years to life. (*People v. Lopez* (2005) 34 Cal.4th 1002, 1004, 1007–1011.)

However, Wallace and Khalill are not entitled to the 15-year minimum parole eligibility term for counts one and two. The California Supreme Court has suggested in dicta that the minimum parole eligibility provision was never intended to apply to

defendants sentenced to life without the possibility of parole. (*People v. Lopez*, *supra*, 34 Cal.4th at p. 1010; *People v. Montes* (2003) 31 Cal.4th 350, 358, fn. 10.) And, unlike the defendant in *People v. Lopez*, *supra*, 34 Cal.4th at pages 1004 through 1005, who was sentenced to a term of 25 years to life for first degree murder, Wallace and Khalill were sentenced to life without parole in counts one and two. It makes no sense, and would serve no purpose, to include minimum parole eligibility dates on such terms.

XIII. *Appellants are jointly and severally liable for victim restitution in count one; Wallace and Khalill are jointly and severally liable for victim restitution in count two*

Wallace contends that all appellants should be jointly and severally liable for victim restitution in count one and that he and Khalill should be jointly and severally liable for victim restitution in count two. The People agree that he is correct. To avoid "unjust enrichment" to the Victim Compensation and Government Claims Board, the abstract of judgment must be corrected to reflect that all three appellants are jointly and severally liable for the $7,500 owed on count one, and that Khalill and Wallace are jointly and severally liable for the remaining $7,747 owed on count two. (*People v. Blackburn* (1999) 72 Cal.App.4th 1520, 1535; *People v. Neely* (2009) 176 Cal.App.4th 787, 800; *People v. Madrana* (1997) 55 Cal.App.4th 1044, 1049–1052.)

## DISPOSITION

The judgments are affirmed as modified. The matter is remanded to the trial court with directions to strike the 10-year sentence on count three (Wallace and Khalill) from the abstracts of judgment and replace it with the 15-year minimum parole eligibility term. The abstract of judgment against Gibbs must also be amended to allow for a 15-year minimum parole eligibility term. The abstracts of judgment must also be modified to reflect appellants' joint and several liability on count one, and Khalill and Wallace's joint and several liability on count two. In all other respects, the judgments are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
                 ASHMANN-GERST


We concur:


_____, P. J.
    BOREN


_____, J.
    CHAVEZ